# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 2, 2026

Lyle W. Cayce
Clerk

---

No. 26-50183

---

IGNACIO SOSNAVA RODRIGUEZ,

*Petitioner—Appellee*,

*versus*

SYLVESTER M. ORTEGA, *in his official capacity as Director of the San Antonio Field Office of ICE Enforcement and Removal Operations*; MARKWAYNE MULLIN, *Secretary, U.S. Department of Homeland Security*; TODD WALLACE BLANCHE, *Acting U.S. Attorney General*; DEPARTMENT OF HOMELAND SECURITY; DOJ EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,

*Respondents—Appellants*,

CONSOLIDATED WITH

---

26-50219

---

ALEJANDRO VILLEGAS ANGEL

*Petitioner—Appellee*,

*versus*

MARKWAYNE MULLIN, *Secretary, U.S. Department of Homeland Security*; TODD WALLACE BLANCHE, *Acting U.S. Attorney General*; MIGUEL VERGARA, *San Antonio Field Office Director for Enforcement and*

*Removal*; United States Department of Homeland Security; United States Immigration and Customs Enforcement; Executive Office for Immigration Review, *Office of the General Counsel*,

*Respondents—Appellants*,

consolidated with

26-50221

Miguel Angel Gomez Alvarado,

*Petitioner—Appellee*,

*versus*

Miguel Vergara, *in his official capacity as the Acting Director of San Antonio Field Office for U.S. Immigration and Customs Enforcement*; Todd Lyons, *in his capacity as the Acting Director for the U.S. Immigration and Customs Enforcement*; Markwayne Mullin, *Secretary, U.S. Department of Homeland Security*,

*Respondents—Appellants*.

Appeal from the United States District Court
for the Western District of Texas
USDC Nos. 1:26-CV-273, 1:26-CV-384,
1:26-CV-309

Before Southwick, Graves, and Wilson, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

Various federal immigration officials challenge on appeal the grant of writs of *habeas corpus* to three aliens who each have resided in the United States for over a decade. Each had entered this country without inspection and had never been authorized to remain. The district court judges granted the writs after concluding that each alien was being detained in violation of the Due Process Clause. Each alien was released from custody, and the Government was prohibited from detaining them again without a hearing to determine their individual dangerousness or risk of flight. Nothing in the orders, however, interfered with the removal proceedings themselves. The three appeals have been consolidated for decision.

As unadmitted aliens, appellees are subject by statute to mandatory detention without bond. *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 506 (5th Cir. 2026); 8 U.S.C. § 1225(b)(2)(A). They assert that their detention violates the Fifth Amendment. In each case, the district court agreed.

The Fifth Amendment provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. In 2001, the Supreme Court stated that the Due Process Clause protects "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001). It is part of the historic majesty of this long-ago founding charter that it makes no exceptions in providing basic rights to those within our boundaries, including a right to be heard when personal liberty is taken. These three aliens, who many years ago entered this country without inspection and have been residing here for years, who have no criminal history, and who, as far as we have been informed, have not yet been subject to a removal order, would today have been detained by immigration authorities for an unreasonable time absent the district courts' intervention. If they were still detained without any removal order having

been entered, they would be entitled to a bond hearing now. We AFFIRM the district courts' granting writs of *habeas corpus*.[1]

We understand the recent interpretation in *Buenrostro-Mendez* that detention is mandatory for anyone who entered this country without authorization is creating enormous difficulties in district courts. Thousands of immigration detainees are filing applications for writs of *habeas corpus* in United States district courts. Our resolution of this case requires the executive branch to provide bond hearings through its own procedures. That shifts the location of the burden, but it leaves its size unaffected. Nonetheless, the answer to those difficulties cannot include ignoring the Constitution. We acknowledge our able colleague in dissent is alert to that requirement but finds no constitutional violation here.

## STATUTORY BACKGROUND

Our law has long drawn a line between those "who may enter the country and [those] who may stay here after entering." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). That distinction results in two different categories: excludable aliens, those "outside the United States seeking admission," and deportable aliens, those already "physically in the United States." *See Landon v. Plasencia*, 459 U.S. 21, 25–26 (1982). Consistent with that distinction, the Department of Homeland Security had, until recently, treated two statutory provisions regarding the detention and removal of aliens as separately governing aliens in those two categories: 8 U.S.C. § 1225 and 8 U.S.C. § 1226. *See Jennings*, 583 U.S. at 287–89.

[1] JUDGE GRAVES would require a hearing for a detainee sooner than the 90 days set out in this opinion, as his separate opinion explains. He therefore concurs in this opinion's conclusion that a hearing must occur by 90 days after detention, even if improperly late in his view.

Congress significantly revised the nation's immigration laws in passing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009–585 ("IIRIRA"). The key statutes we will apply, Sections 1225 and 1226, were among the revisions found in IIRIRA.

Section 1225 governs the inspection and detention of arriving aliens. "An alien present in the United States who has not been admitted" is "deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). Admission requires "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *Id.* § 1101(a)(13)(A). With limited exceptions not applicable here, Section 1225 requires that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained" for a removal proceeding. *Id.* § 1225(b)(2)(A).

Section 1226 applies to the apprehension and detention of removable aliens. Most aliens arrested under Section 1226 may be released on bond or conditional parole while a determination of their removability is ongoing. *See id.* § 1226(a)(2). Certain criminal aliens, including those charged with violent felonies, must be detained without bond. *Id.* § 1226(c).

From 1996 until 2025, the Department of Homeland Security applied Section 1226(a) to the detention of unadmitted resident aliens, like those here, who were awaiting a decision on removal. *See Buenrostro-Mendez*, 166 F.4th at 500, 506. Under Section 1226(a), detention is not mandatory; prior to the Government's changing its position in 2025, "the Government ha[d], for twenty-nine years, allowed illegal resident aliens . . . to seek release on bond under § 1226(a)." *Id.* at 506. That view fit within Section 1226(a)'s grant of discretionary authority to the Attorney General to release a noncriminal alien arrested inside the country on bond pending a decision on

whether the alien was to be removed. *Nielsen v. Preap*, 586 U.S. 392, 397 (2019); 8 U.S.C. § 1226(a)(2).

Agency regulation standardized this discretion. A Department of Homeland Security officer undertook the initial determination on bond, considering whether the alien "would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). The Government or alien could then appeal that decision to an immigration judge, who redetermined whether bond is warranted, considering "any information that is available to the Immigration Judge or that is presented to him or her by the alien or the Service." 8 C.F.R. §§ 1003.19(d), 1236.1(d)(1). Further appeal was available to the Board of Immigration Appeals. 8 C.F.R. § 1236.1(d)(3).

As of September 2025, the Department of Homeland Security altered these practices as to unadmitted resident aliens. *See Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 227–29 (BIA 2025). The BIA concluded the plain language of Section 1225(b)(2)(A) applied to "aliens unlawfully entering the United States without inspection" no matter how long the "alien has avoided apprehension." *Id.* at 228. Such aliens remained, the BIA concluded, "applicants for admission until and unless they are lawfully inspected and admitted by an immigration officer." *Id.* In other words, even after long physical presence in this country, aliens remain "seeking admission" and "applicants for admission." Consequently, the BIA decided that immigration judges "have no authority to redetermine the custody conditions of an alien who crossed the border unlawfully without inspection, even if that alien has avoided apprehension for more than 2 years." *Id.*

In February 2026, this court upheld the Government's interpretation of the statutory provisions. *Buenrostro-Mendez*, 166 F.4th at 508. The three aliens before us go beyond statutory text to present a constitutional claim.

They do not contest their *removal* in this appeal. Instead, they contend that those detained under Section 1225(b)(A) are entitled by the Constitution to a hearing at some point to determine the justification for their *detention*. The issue affects far more individuals than the three individuals in this case. The Department of Homeland Security has detained thousands of resident aliens under Section 1225(b)(2)(A) without bond.

## FACTUAL AND PROCEDURAL BACKGROUND

The backgrounds of the three aliens before us, Ignacio Sosnava Rodriguez, Alejandro Villegas Angel, and Miguel Angel Gomez Alvarado, bear relevant similarities. They each illegally entered this country more than a decade ago. They have been long-time residents of the United States, with no criminal history, and are fathers of United States citizens. They each have applied or assert they intend to apply for cancellation of removal under 8 U.S.C. § 1229b(b)(1), which permits the Attorney General to cancel the removal of certain aliens, on the basis that removal would "result in exceptional and extremely unusual hardship" to a child who is a United States citizen. We provide a few additional individual details.

Ignacio Sosnava Rodriguez, a citizen of Mexico, entered the United States in 2004, evading inspection. On December 23, 2025, he was stopped in Elgin, Texas, for a problem with his vehicle light. Texas state police called U.S. Immigration and Customs Enforcement ("ICE") to the traffic stop, and an ICE officer detained Sosnava Rodriguez.

Alejandro Villegas Angel, a citizen of Mexico, entered the United States in 2011, and he also evaded inspection. On February 10, 2026, he was stopped in Lockhart, Texas, for driving without a license. Upon being identified, he was transferred to ICE custody.

Miguel Angel Gomez Alvarado, a citizen of Honduras, entered the United States in 2012, also without inspection. On November 13, 2025,

Alvarado was detained by ICE after the agency was called to a traffic stop in Florence, Texas.

All three men filed an application for a writ of *habeas corpus* in the United States District Court for the Western District of Texas. *See* 28 U.S.C. § 2241. The three applications were considered by two different district court judges. In each case, the district court determined that the applicant could raise a Fifth Amendment challenge to his mandatory detention without bond and applied the procedural due process factors set out by the Supreme Court case *Mathews v. Eldridge*, 424 U.S. 319 (1975). The courts concluded that the detentions violated the Due Process Clause and ordered the immediate release of each alien.[2]

The Government timely appealed from each order. This court granted the Government's motion to consolidate the three appeals for expedited consideration.

## DISCUSSION

The Government insists there were three errors in the district courts' interpretation of the Due Process Clause: (1) because the three aliens had not been statutorily "admitted," they are not entitled to due process; (2) the statutory structure of Section 1225(b)(2)(A) forecloses any claim of procedural due process; and (3) even if the aliens could invoke the Constitution's protections, they have no right to a bond hearing.

The problem with the first two arguments is that even though the BIA reinterpreted the meaning of statutory language, the Constitution has not changed. As we will explain, statutory admission status does not decide when

---

[2] Ignacio Sosnava Rodriguez was released from custody on February 27, 2026. Alejandro Villegas Angel and Miguel Angel Gomez Alvarado were released from custody on March 5, 2026.

aliens gain due process rights. The Constitution, after all, is supreme, with statutes' needing to conform to its dictates, not the Constitution to statutes. We are left to consider what rights aliens such as these three have under the Constitution.

*I. Entitlement to Due Process*

For over a century, aliens' entitlement to due process has been governed by physical presence within the United States. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896). "'[A]ll persons within the territory of the United States,' including aliens unlawfully present, may invoke the Fifth and Sixth Amendments to challenge actions of the Federal Government." *Plyler v. Doe*, 457 U.S. 202, 212 (1982) (quoting *Wong Wing*, 163 U.S. at 238). Meanwhile, "an alien on the threshold of initial entry stands on a different footing" than "aliens who have . . . passed through our gates." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). An alien's "right to enter the United States depends on the congressional will." *Id.* at 216. This "territorial theme," the idea that physical presence in the country is key, has been omnipresent in immigration jurisprudence. *See Plyler*, 457 U.S. at 212. As a preview, we mention the Government's argument that recent United States Supreme Court caselaw has discarded such protections.

An early twentieth-century Supreme Court opinion, *Yamataya v. Fisher (The Japanese Immigrant Case)*, 189 U.S. 86 (1903), provides an example of this constitutional distinction. Four days after Kaoru Yamataya, a Japanese citizen, entered the United States, an immigration inspector concluded she had arrived in the country illegally because she was likely to become a public charge, a class of aliens excluded from entry by then-existing law. *Yamataya*, 189 U.S. at 94. The Secretary of the Treasury issued a warrant for her deportation. *Id.* Yamataya filed for a writ of *habeas corpus*,

asserting that the inspector's investigation had been inadequate and that she had no opportunity to contest her deportation. *Id.*

The Supreme Court began by recognizing Congress's nearly unlimited power over the exclusion of aliens from the country, *i.e.*, preventing entry, explaining that Congress could both enact a regulatory scheme for exclusion and "commit the enforcement of such provisions, conditions, and regulations exclusively to executive officers, without judicial intervention." *Id.* at 97. Yamataya's case, according to the Court, presented a different question: "What was the extent of the authority of the executive officers of the government over the petitioner after she landed?" *Id.* at 99.

The Court rejected the argument "that administrative officers, when executing the provisions of a statute involving the liberty of persons, [could] disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution."[3] *Id.* at 100. Immigration authorities did not have the "arbitrary power" to "take[] into custody and deport[]" an alien "who has entered the country, and ha[d] become subject in all respects to its jurisdiction, and a part of its population although alleged to be illegally here" without providing them "all opportunity to be heard upon the questions involving his right to be and remain in the United States." *Id.* at 101. No such power could exist "where the principles involved in due process of law are recognized." *Id.*

[3] The *Yamataya* Court left open the question of whether an alien could "rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, *and* who has been here for too brief a period to have become, in any real sense, a part of our population." 189 U.S. at 100 (emphasis added). As discussed in the succeeding pages, the Supreme Court has answered this question by tempering the physical presence rule into something more flexible than a strict inside-or-outside the country binary.

In the intervening nearly five quarters of a century since *Yamataya*, the precept that the Due Process Clause protects all persons residing in the United States has frequently been repeated by the Supreme Court. Once was in 1953: "It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Mezei*, 345 U.S. at 212. In 1976, the Court reminded us: "There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law." *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). The Court repeated itself again in 1982: "Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler*, 457 U.S. at 210. We have already referred to the Court's statement in 2001 that the Due Process Clause protects "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693–94.

The *Plyler* Court, affirming the Fifth Circuit's application of the Equal Protection Clause to illegal aliens residing in the United States, explained the rationale for the physical-presence rule in a series of footnotes. The Court agreed with an early writer's conclusion that "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Plyler*, 457 U.S. at 211 n.10 (citing Clement L. Bouvé, A Treatise on the Laws Governing Exclusion and Expulsion of Aliens in the United States 425–427 (1912)).

Another source of authority was JUSTICE FIELD's separate opinion in *Wong Wing*:

> The term "person," used in the Fifth Amendment, is broad enough to include any and every human being within the jurisdiction of the republic. A resident, alien born, is entitled to the same protection under the laws that a citizen is entitled to. He owes obedience to the laws of the country in which he is domiciled, and, as a consequence, he is entitled to the equal protection of those laws.

*Id.* at 212 n.11 (quoting *Wong Wing*, 163 U.S. at 242–43 (FIELD, J., concurring in part and dissenting in part)).[4]

In the latest of the long line of cases addressing this question, the Supreme Court considered whether a Sri Lankan national, Vijayakumar Thuraissigiam, who was detained *almost* immediately after his unauthorized entry — he had walked 25 yards into the United States from Mexico — could invoke the Due Process Clause to contest the handling of his asylum proceedings. *DHS v. Thuraissigiam*, 591 U.S. 103, 114–15 (2020). The Court began by restating the axiom that "aliens who have established connections in this country have due process rights in deportation proceedings," but "alien[s] at the threshold of initial entry" do not. *Id.* at 107.

Applying the "century-old rule regarding the due process rights of an alien seeking initial entry," the Court considered whether Thuraissigiam

---

[4] JUSTICE FIELD's opinion echoed James Madison in his REPORT ON THE VIRGINIA RESOLUTIONS. Madison, criticizing the Alien and Sedition Acts, wrote: "[I]t does not follow, because aliens are not parties to the Constitution, as citizens are parties to it, that, whilst they actually conform to it, they have no right to its protection. Aliens are not more parties to the laws than they are parties to the Constitution; yet it will not be disputed that, as they owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage." 4 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 556 (Jonathan Elliot 2d. ed 1836).

was, by law, still "on the threshold" even if he had in fact "set foot on U.S. soil." *Id.* at 139–140 (quoting *Mezei*, 345 U.S. at 212). The Court held that "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry'" into the country. *Id.* at 140 (quoting *Zadvydas*, 533 U.S. at 693). The Court concluded that Thuraissigiam was entitled only to the process that Congress had provided, not the independent guarantees of our Constitution. *Id.* at 138–39. *Thuraissigiam* did not alter the long-standing dichotomy between the due process rights of aliens at the border and aliens within the country; *Thuraissigiam* applied existing law to a new factual situation. The issue was not statutory "admission," but physical entry beyond a *de minimis* distance.

Quite to the contrary, the Government insists the proper rule to be drawn from *Thuraissigiam* — and, indeed, it argues this has been the rule for more than a century — is that "for aliens who never 'been admitted into the country pursuant to law, the decisions of executive and administrative officers, acting within the powers expressly conferred by Congress, are due process of law.'" That language is a quote from *Thuraissigiam*, which was quoting *Nishimura Ekiu v. United States,* 142 U.S. 651, 660 (1892). The Government omits the preceding clause that changes the meaning of the selected language. The full quote from *Thursaissigiam* is as follows:

> [A]s to "foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law," "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law."

*Thuraissigiam*, 591 U.S. at 138 (quoting *Nishimura Ekiu*, 142 U.S. at 660). As we already quoted, the *Thuraissigiam* Court earlier in its opinion confirmed the distinction between those "aliens who have established connections in

this country" and those who have not. *Id.* at 107. To assert that *Thuraissigiam* actually eliminates such rights for those with an established presence is not credible. The Court's holding confirms the continuing relevance of a physical presence requirement, distinguishing those who have "acquired any domicil or residence within the United States" from those who have not. *Id.* at 138. Statutory "admission" and its limitations do not eliminate these long-standing constitutional distinctions. Certainly, the *Nishimura Ekiu* Court, quoted by *Thuraissigiam*, included "nor even been admitted into the country pursuant to law" in its list of three ways in which the alien in that case had not substantiated a meaningful presence in this country. Quite differently, the three aliens in the case before us fully satisfied another one of them, namely, maintaining a long-term residence in the United States.

The Government also contends that caselaw on an exception to the physical presence rule for aliens paroled into the country supports its position: "[A]liens who arrive at ports of entry — even those paroled elsewhere in the country for years pending removal — are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* at 139 (quoting *Mezei*, 345 U.S. at 215). This exception is narrow, avoiding "needless confinement . . . while administrative proceedings are conducted." *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958). The parole fiction was intended to encourage conditional release. Parole is the constitutional equivalent to a continuation of "detention" at the border, though "enlarg[ing]" the "prison bounds." *See id.* at 189–90.

Such narrow exceptions are inapplicable here. The *Thuraissigiam* Court supplied pages of reasoning to support that entering 25 yards into this country and then being apprehended could be treated as the equivalent of being stopped at the border. The Government is trying to equate that to the entry of hundreds of miles and years of residence. Such supposed

equivalence is far more than a convenient legal fiction. It is a complete fantasy. It also ignores that those who have "acquired any domicil or residence within the United States" are explicitly among those for whom decision-making by executive branch officials is not the limit of the process due them. *Thuraissigiam*, 591 U.S. at 138 (citation omitted).

*Yamataya*, *Mezei*, *Mathews*, *Zadvydas*, *Plyler*, and the other half-dozen or more cases that could have been cited for the physical presence rule "remain binding precedent until [the Supreme Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *See Hohn v. United States*, 524 U.S. 236, 252–53 (1998). The Court "does not normally overturn . . . earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). The Supreme Court did not overrule those cases in *Thuraissigiam*. Indeed, much of the analysis was simply to show that alien's 25-yard entry in the United States was not enough to qualify him for the protections of such caselaw.

In summary, aliens who arrive at an "international airport" or walk a dozen steps onto United States soil, are not, by sheer dint of crossing a boundary line, cloaked in the full protection of the United States Constitution. *See Thuraissigiam*, 591 U.S. at 139. The Court's precedents have not been an overly rigid, formulaic application of the physical presence rule. The present case, though, has no such nuances that need addressing. Entry and residence, not legal admission, dictate the extent of the Constitution's application. These aliens have each lived on United States soil for over a decade, had children in the United States, owed obedience to the laws of this country, and are, as a result, entitled to the protections of the Due Process Clause.

### *II. Due Process Principles*

The Government argues that regardless of the caselaw we have just discussed, what controls here is the lack of any statutory procedural rights for release from detention for aliens subject to Section 1225(b)(2)(A). The statute is clear that they "shall be detained for a [removal] proceeding." 8 U.S.C. § 1225(b)(2)(A). The statutory language "unambiguously provides for mandatory detention." *Buenrostro-Mendez*, 166 F.4th at 502. The Government insists that this absence of statutory rights means there are no constitutional ones. At best, that is true when there is no substantive right independent of the statute. Statutes do not override the Constitution, of course, so we must continue to enforce substantive constitutional rights regardless of statutory language.

"[T]he Due Process Clause provides that certain substantive rights — life, liberty, and property — cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). The Government's focus on what a statute does not provide ignores that any "right to due process 'is conferred, not by legislative grace, but by constitutional guarantee.'" *Id.* (quoting *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974) (POWELL, J., concurring in part)).

The principal support for the Government's insistence that the statute controls here is the exceptionally inapt *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003). There, the Court considered a procedural due process challenge to placement on a public sex offender registry, certainly not an issue drawing on long-recognized fundamental, substantive rights. *Doe*, 538 U.S. at 5. The challenger claimed he had a liberty interest in his reputation; accordingly, the state law establishing the registry purportedly violated procedural due process because the state had failed to provide him with a hearing to disprove his dangerousness. *Id*. at 5–

7. He expressly disclaimed a substantive due process challenge to the law. *Id.* at 8. The Court held that he had no procedural right to a hearing because "any hearing on current dangerousness [would have been] a bootless exercise." *Id.* at 7–8. It was bootless because the duty to register did not hinge on dangerousness but solely on a conviction of the offense — all sex offenders had to be registered. *Id.*

Moreover, dangerousness also had no relevance to his constitutional claim, as he did not assert that dangerousness had any bearing on the Government's authority to require registration of those convicted of crimes. Doe had not established the Connecticut statute requiring all sex-offenders, dangerous or not, to register was "defective" as a "*substantive* rule of law" by "conflicting with a provision of the Constitution." *Id.* at 7.

Justice Scalia's concurrence in *Doe* provides additional clarity. There, he suggested that "the categorical abrogation of [a] liberty interest by a validly enacted statute suffices to provide all the process that is 'due' . . . [a]bsent a claim (which respondent ha[d] not made [in *Doe*]) that the liberty interest in question is so fundamental as to implicate so-called 'substantive' due process." *Id.* at 8 (Scalia, J., concurring). His example shows the principle's limit: "a state law providing that no one under the age of 16 may operate a motor vehicle suffices to abrogate that liberty interest." *Id.* In other words, there was no substantive right to a driver's license. Thus, setting age limits was not a violation of any rights existing outside the statute, making the statute's processes the process that was due.

Justice Scalia earlier explained, writing for the Court, that a substantive claim of due process is that the Government "cannot deprive [the claimant] of their asserted liberty interest *at all*," while a procedural due process claim is that the Government cannot "cannot deprive [the claimant] of their asserted liberty interest . . . on the basis of the procedures it

provides." *Reno v. Flores*, 507 U.S. 292, 306 (1993). Described otherwise, "the substantive issue involves a definition of that protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it," while "[t]he procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Mills v. Rogers*, 457 U.S. 291, 299 (1982). It may not always be evident whether a plaintiff's claim sounds in substantive or procedural due process.[5] Both possibilities are before us because, unlike in *Doe*, the three aliens in this appeal have not renounced any substantive claim.

In sum, *Doe* did not create a new standard to be met for due process claims of violations of fundamental rights. Instead, it teaches that when a statute that abrogates a claimed liberty interest does not substantively violate the Constitution, the Due Process Clause does not impose any additional procedural protection. The three aliens before us assert that the deprivation of their physical liberty without justification substantively violates their right to liberty from physical constraint enumerated in the Constitution. They concede there are "conditions under which competing state interests might outweigh" their Fifth Amendment liberty interest. What they seek is recognition of a procedural right to prove those conditions do not exist and

---

[5] One scholar makes a valid point that "any time a right whose abridgment may be justified (by, for example, a compelling state interest) is infringed, one could restate the claim as one that the state failed to provide adequate procedure for determining whether the conditions were present that rendered the deprivation lawful." Peter J. Rubin, *Square Pegs and Round Holes: Substantive Due Process, Procedural Due Process, and the Bill of Rights*, 103 COLUM. L. REV. 833, 848 (2003). Professor Rubin concluded this doctrinal distinction is especially hazy in cases of "deprivations of substantive rights that are provided only contingently, that are defined in terms of process." *Id.* Nonetheless, the briefing of the procedural and substantive rights is sufficient to permit an analysis of both aspects.

that their right to be at liberty "actually is outweighed in [this] particular instance." The necessary corollary of the argument is that without those procedures their detention under Section 1225(b)(2)(A) violates the Fifth Amendment. Accordingly, *Doe* has no application.[6]

The three district court orders here concluded that the proper analysis was under procedural due process. For example, in the order as to Alejandro Villegas Angel, that district court held: "Petitioner is challenging the process that is due to him before he can be deprived of a protected interest—his liberty. That is squarely a procedural due process claim. *See Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976)." All three orders identify the right as the fundamental liberty interest to be free from imprisonment, *i.e.*, immigration detention. The briefs of the three aliens also take that position. We agree that this is a procedural due process claim.

Adjudicating claims like those here is the ordinary function of courts. Once a plaintiff demonstrates a liberty interest "within the Fourteenth [or Fifth] Amendment's protection," then we must "determine[] 'what process is due' in the particular context." *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 847 (1977).

That determination may not be superseded or eliminated by statute. "[C]ertain substantive rights — life, liberty, and property — cannot be deprived except pursuant to constitutionally adequate procedures." *Loudermill*, 470 U.S. at 541. Allowing the Due Process Clause to be "defined

---

[6] In the 23 years since the Supreme Court decided *Doe*, no federal appellate court has ever applied that decision to an immigration case — despite a surfeit of cases addressing the question of what, if any, protections procedural due process requires under a similar mandatory detention regime in 28 U.S.C. § 1226(c). *See, e.g.*, *Black v. Decker*, 103 F.4th 133, 149–59 (2d Cir. 2024), *cert. granted sub nom.*, *Genalo v. Black*, No. 25-886, 2026 WL 1718025 (U.S. June 15, 2026).

by the procedures provided for its deprivation" would leave the Clause "reduced to a mere tautology." *Id.* The three men before us contend they have been deprived of their right to liberty without constitutionally adequate procedures, a violation of the Due Process Clause. We now examine the procedures for their adequacy.

*III. Due Process Right to Contest Immigration Detention*

Having concluded that these three aliens are entitled to invoke the protections of the Due Process Clause, we also must determine what those protections are. In addressing the Government's arguments, we return briefly to our conclusion that this is a procedural due process case.

The Government contends that these claims should be governed by two Supreme Court cases: *Washington v. Glucksberg*, 521 U.S. 702 (1997) and *Demore v. Kim*, 538 U.S. 510 (2003). Their detention does not, according to the Government, implicate an already-recognized fundamental right, and thus, their claimed liberty interest must be tested under the substantive due process framework laid out in *Glucksberg*. In addition, the Government asserts that the Supreme Court's straightforward statement in a similar case, "[d]etention during removal proceedings is a constitutionally permissible part of that process," *Demore*, 538 U.S. at 531, supports that there is no liberty interest to be protected here.

We start with a summary. *Glucksberg* is inapposite because the aliens claim here the long-recognized, fundamental right to be free from physical restraint by the Government. *Demore* applies, but the *Demore* Court concerned removable aliens who had been convicted of crimes; it did not approve of a *per se* detention of all aliens pending removal proceedings.

*A. Freedom from Government Detention as a Fundamental Right*

In *Glucksberg*, the Supreme Court addressed whether terminally ill patients possessed a constitutionally guaranteed liberty interest in physician-assisted suicide. 521 U.S. at 708. That right was, quite obviously, not a "specific freedom[] protected by the Bill of Rights." *Id.* at 720. The Court announced a test for courts to apply when "break[ing] new ground" by recognizing a previously unacknowledged liberty interest or right protected by the Constitution: The asserted right, carefully described, must be "so deeply rooted in our history and traditions, or so fundamental to our concept of constitutionally ordered liberty" as to warrant due process protection. *Id.* at 720, 727 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

We do not find it necessary to make that inquiry here. We are clearly not breaking new ground. The spadework is done; the ground is broken; indeed, the structure is built: "Freedom from physical restraint [is] a fundamental right." *Foucha v. Louisiana*, 504 U.S. 71, 86 (1992). Aliens, even those in removal proceedings, may assert that right. *See Zadvydas*, 533 U.S. at 690. The right to liberty, as an enumerated right, is not subject to the *Glucksberg* inquiry. In *Glucksberg*, the Court agreed that "'liberty' . . . includes more than the absence of physical restraint." 521 U.S. at 719. The *Gluckberg* inquiry is the means by which the courts must test the outer scope of that "more." In this case, though, the three individuals are not claiming more. They seek only the absence of physical restraint.

The Government nonetheless contends that the detention here "does not implicate any fundamental rights" because the United States does not have a history or tradition of bail for aliens during removal proceedings. Few of the Supreme Court's landmark liberty cases would survive such exacting scrutiny. It would be difficult to argue, for example, that there is a

history or tradition of one found not guilty of a crime based on insanity's entitlement to freedom from psychiatric commitment, *see Foucha*, 504 U.S. at 80–82, or a right of citizens acting as enemy combatants to freedom from military custody, *see Hamdi v. Rumsfeld*, 542 U.S. 507, 532 (2004) (plurality op.). Nonetheless, the Court did not attempt to make any such showing in *Foucha* and *Hamdi*. There was no need to consider history and tradition because the freedom from physical restraint, in whatever form, is at the "core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha*, 504 U.S. at 80. That right cannot be abridged by Congress or this court. It may be limited, but only with justification.

*B. Immigration Detention*

"Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). The Supreme Court has explained that the right to liberty from civil confinement, in particular, may be infringed only where a "where a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Zadvydas*, 533 U.S. at 690 (quoting *Kansas v. Hendricks,* 521 U.S. 346, 356 (1997)). The Supreme Court has singled out dangerousness and flight risk as special justifications for detention in the immigration proceedings. *See id.*

An alien's right to liberty must also be considered in context. "[I]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."[7] *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976). "Detention during

---

[7] A brief note on the extent of the Congress's plenary power is necessary. There is no doubt that "the power to admit or exclude aliens is a sovereign prerogative." *Landon*

removal proceedings is a constitutionally permissible part of that process." *Demore*, 538 U.S. at 531. We are not the first to consider the balance between these competing principles. The Supreme Court has provided guidance in several cases including, most notably, *Zadvydas* and *Demore*.

In the earlier opinion, the Supreme Court in *Zadvydas* considered two *habeas* challenges by aliens who were detained under 8 U.S.C. § 1231(a)(6). 533 U.S. at 686. Section 1231(a)(6) provides the Attorney General with the discretion to confine certain removable aliens indefinitely beyond their removal period. *Id.* at 686–89. The Court warned that a "statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Id.* at 690. The Court applied its line of civil detention cases, explaining the Government must show "a special justification, such as harm-threatening mental illness, outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* (quoting *Hendricks*, 521 U.S. at 356).

The Court rejected the Government's supposition that an "alien's removable status itself, which bears no relation to a detainee's dangerousness" could justify detention. *Id.* at 691–92. Instead, the Court considered two other "regulatory goals" of the statute put forward by the

*v. Plasencia*, 459 U.S. 21, 32 (1982). But that prerogative is not boundless; there are "important constitutional limitations." *Zadvydas* 533 U.S. 678, 695 (2001).

The Bill of Rights was intended to constrain the federal government's conduct even within its areas of prerogative. Before the adoption of the Bill of Rights, Thomas Jefferson wrote to James Madison, the author of the Due Process Clause, that the Constitution "forms us into one state as to certain objects, and gives us a legislative and executive body for these objects." Letter from Thomas Jefferson to James Madison (Mar. 15, 1789), *in* 14 THE PAPERS OF THOMAS JEFFERSON 660 (Julian P. Boyd ed. 1958). Jefferson reassured Madison of the virtue of adopting a declaration of rights, that the Constitution "should therefore guard us against their abuses of power within the f[ie]ld submitted to them." *Id.* The guard that is relevant here is the Fifth Amendment.

Government: flight risk and dangerousness.[8] *Id.* at 690. "The first justification — preventing flight — [was] weak or nonexistent where removal seems a remote possibility at best." *Id.* Dangerousness, the Court explained, only served as a proper justification when "limited to specially dangerous individuals and subject to strong procedural protections." *Id.* at 691. Under the statute, "the sole procedural protections available to the alien[s]" to contest their detention were "found in administrative proceedings" when "[t]he Constitution demands greater procedural protection even for property." *Id.* at 692. The administrative procedures were insufficient to safeguard the statute from grave constitutional questions. Accordingly, the Court avoided the constitutional defect by construing Section 1231(a)(6) to apply only while removal is "reasonably foreseeable." *Id.* at 699. Detention was presumed reasonable for six months. *Id.* at 701.

Two years later, the Supreme Court again addressed the issue of alien detention in *Demore*. The Court reviewed the constitutionality of an alien's confinement under 8 U.S.C. § 1226(c), which requires mandatory detention without bond for certain criminal aliens during the removal process. *Demore*,

---

[8] Dangerousness and flight risk have long been viewed as justifications for detention in immigration proceedings. *See, e.g.*, *Leng May Ma*, 357 U.S. at 190 ("Physical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond.").

These factors are also used by the Government in determining which deportable aliens should be released on bond, when bond is permitted. 8 C.F.R. § 1236.1(c)(8) provides:

> Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien . . . provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

538 U.S. at 517–19.[9] Section 1226(c) is the closest statutory analogue to our current understanding of Section 1225(b)(2)(A), elucidated by this court in *Buenrostro-Mendez*.

The Court upheld the alien's detention under Section 1226(c), reasoning that Congress could mandate no-bail detention of "a subset of deportable criminal aliens." *Id.* at 521. The *Demore* Court distinguished *Zadvydas*. First, the detention in *Demore*, unlike in *Zadvydas*, had a "reasonable relation" to preventing flight. *Id.* at 527 (quoting *Zadvydas*, 533 U.S. at 690). Congress had deemed that detention under 1226(c) "serve[d] the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings" based on "evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." *Id.* at 527–28. The Court concluded that the "evidence Congress had before it . . . support[ed] the approach it selected." *Id.* at 528.

Second, the period of detention at issue in *Demore* under Section 1226(c) was "of a much shorter duration" than the indefinite and potentially permanent detention reviewed in *Zadvydas*. *Id*. According to statistics provided by the Government in *Demore*, detention in the vast majority of cases under Section 1226(c) lasted then "an average time of 47 days and a

---

[9] Kim was the immigrant petitioner for a writ of *habeas corpus*, while Demore was the governmental respondent. The shortform for the case should be *Kim*, but this precedent is almost universally referred to as *Demore.* We concede the point.

median of 30 days."[10] *Id.* We will return to this distinction later, because it has a significant role in our interpretations.

The Court agreed with the Government that the Due Process Clause does not always require individualized determinations, such as in bond hearings, of the reasons for detention. *Id.* at 528. Congress's categorical judgment, supported by evidence, that no-bond detention for the select criminal aliens was necessary to prevent flight and limit dangerousness served to provide the necessary justification *en masse*. *See id.* at 528. Importantly, the aliens' criminal convictions had been "secured following full procedural protections." *Id*. at 525 n.9. The convictions "reflect[ed] 'personal activity' that Congress considered relevant to future dangerousness." *Id*.

*Demore* relied on a 50-year-old precedent, *Carlson v. Landon*, 342 U.S. 524 (1952), to conclude that individual determinations of dangerousness or flight are not always required. *Id.* at 523–26. The *Demore* Court explained that *Carlson* had held "denial of bail was permissible 'by reference to the legislative scheme to eradicate the evils of Communist activity.'" *Id.* at 525 (quoting *Carlson*, 342 U.S. at 543). We look to *Carlson* to see how it adds to our understanding of *Demore.*

In *Carlson*, too, the Supreme Court considered the evidence Congress had before it to be "sufficient to furnish reasonable ground for action against alien resident Communists." 342 U.S. at 536. Specifically, "Congress' understanding of [Communists'] attitude toward the use of force and violence in such a constitutional democracy as ours to accomplish their

[10] The Government later acknowledged that these statistics were erroneous. *See Jennings*, 583 U.S. at 343 (Breyer, J., dissenting). Nonetheless, the relative brevity of detention was part of the reasoning in *Demore* for not requiring a hearing.

political aims." *Id.* at 541. The Court acknowledged "[d]etention is necessarily a part of [the] deportation procedure" because "[o]therwise aliens arrested for deportation would have opportunities to hurt the United States during the pendency of deportation proceedings." *Id.* at 538. Therefore, there was no "denial of the due process of the Fifth Amendment under circumstances where there is reasonable apprehension of hurt from aliens charged with a philosophy of violence against this Government." *Id.* at 542. Still, the Court cautioned that "[o]f course *purpose to injure could not be imputed generally to all aliens subject to deportation*." *Id*. at 538 (emphasis added). The Court stated: "It is quite clear . . . that detention without bond has been the exception." *Id.* at 538 n.31.

In each case, the Supreme Court analyzed the justifications for the detention regime in question. None of those decisions support either that no-bail detention is *per se* constitutional or that Congress may require a vast category of persons within the United States be confined for lengthy periods without process. The Supreme Court's post-*Demore* decisions buttress our conclusions. Since 2003, the Court has recognized the existence of as-applied challenges to Section 1226(c), the statute at issue in *Demore*. In one recent case, the Court left open the question of what the Due Process Clause requires to justify alien detention under Section 1226(c). *Jennings*, 583 U.S. at 312 (remanding to the Court of Appeals to address the appellants' constitutional challenges to Sections 1225(b), 1226(a) and 1226(c)). In another case interpreting Section 1226(c), the Court elaborated that its "decision . . . on the meaning of [Section 1226(c)] does not foreclose as-applied challenges — that is, constitutional challenges to applications of the statute as we have now read it." *Nielsen v. Preap*, 586 U.S. 392, 420 (2019).

Some other circuit courts have taken the Supreme Court at its word, imposing procedural limits on Section 1226(c). The Second Circuit "conclude[d] that the Fifth Amendment's guarantee of due process

precludes a noncitizen's unreasonably prolonged detention under section 1226(c) without a bond hearing." *Black*, 103 F.4th at 159.[11] The Sixth Circuit summarized that when "immigration detention becomes needlessly prolonged and appears to no longer effectuate the regulatory goals of civil immigration detention, courts routinely hold that the Due Process Clause requires an individualized bond hearing to justify a noncitizen's continued detention." *Lopez-Campos v. Raycraft*, 175 F.4th 713, 732–33 (6th Cir. 2026).

Viewing *Zadvydas*, *Demore*, and *Carlson* together, we discern the following principles: 1) Congress may provide a categorical justification for detention; 2) that justification must be provided for a limited subset of aliens with a reasoned basis; 3) aliens may not be detained for indefinite and extensive periods of time without an individualized determination; and 4) aliens may not be indefinitely detained based on illegal entry status alone.

*C. Categorical Justification*

With those principles in hand, we follow the example of the Supreme Court in *Demore* and *Carlson* and consider whether the "the denial of bail was permissible 'by reference to the legislative scheme.'" *Demore*, 538 U.S. at 525 (quoting *Carlson*, 342 U.S. at 543).

To start, Section 1225(b)(2)(A) requires the mandatory detention of all unadmitted aliens. *See Buenrostro-Mendez*, 166 F.4th at 508. In reaching that decision, the court examined what Congress indicated were the reasons for immigration detention. *Id.* (discussing a House Report).

---

[11] On June 15, the Supreme Court granted the Government's petition for a writ of *certiorari* to resolve the question of whether there is a point at which due process requires a bond hearing under Section 1226(c). *Genalo v. Black*, No. 25-886, 2026 WL 1718025 (U.S. June 15, 2026).

One helpful opinion in which Congress's reasoning was examined was *United States v. Salerno*, 481 U.S. 739 (1987). The reasoning was needed because "the Government's regulatory interest in community safety can, in *appropriate circumstances*, outweigh an individual's liberty interest." *Salerno*, 481 U.S. at 748 (emphasis added). The Court determined that when Congress enacts a statute requiring civil detention, the statute there being the Bail Reform Act of 1984, we must "evaluate[]" whether Congress's "delineation of the circumstances under which detention will be permitted satisfies this standard." *Id.* at 749, 751. The Supreme Court approved a pre-trial detention statute that "operate[d] only on individuals who have been arrested for a specific category of extremely serious offenses." *Id.* at 750. Importantly, "Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest." *Id.* The Court distinguished between Congress's approach, which required a "full-blown adversary hearing" on probable cause, and a hypothetical, impermissible "scattershot attempt" by Congress to "incapacitate those who are merely suspected of these serious crimes." *Id.*

We "evaluate[]" Congress's "delineation of the circumstances" here to determine if denial of bail was permissible by "reference to the legislative scheme." *See id.* at 749, 751; *Demore*, 538 U.S. at 525 (citation omitted).

The Government in this case refers us to this court's earlier finding that the "predominant goal" in the enactment of the relevant sections of the IIRIRA was to "put aliens seeking admission lawfully on equal footing with those who entered without inspection." *Buenrostro-Mendez*, 166 F.4th at 508. Even so, the Constitution must also be considered. We have explained that the Constitution treats aliens residing inside the country differently than those stopped at or adjacent to the border, including with regards to detention. *Compare Mezei*, 345 U.S. at 215–16 (permitting indefinite detention of aliens at the border pending removal), *with Zadvydas*, 533 U.S.

at 696 (describing serious constitutional issues with indefinite detention for aliens ordered removed from within the United States).

A little more about Congressional purposes. As to aliens who have been convicted of crimes, detention was needed to prevent them "from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *See Demore*, 538 U.S. at 528. The *Demore* Court relied on this justification and cited substantial evidence before Congress about the frequency of flight and other problems. *Id.* at 518–19, 526 (citing House and Senate reports, as well as other evidence, on the particular risk of criminal aliens).

As to the specific provision relevant here, Section 1225(b)(2)(A), Congress certainly was aware that noncriminal aliens might flee, too, but the frequency and the negative effects of such flight, *i.e.*, recidivism, were shown specifically to exist as to criminal aliens. Mandatory detention was regarded as a solution to that reality. There was no such connection drawn between the slight evidence on noncriminal aliens and mandatory detention. Those like the three aliens here also have not engaged in "personal activity" that Congress "considered relevant to" dangerousness and flight risk. *Demore*, 538 U.S. at 525 n.9.

Indeed, insofar as permitting prolonged detention, Section 1225(b)(2)(A) does not compare favorably to the statutory regime considered in *Salerno*, nor to the one approved in *Demore*. Section 1225(b)(2)(A) is not "narrowly focuse[d] on a particularly acute problem" relating to the Government's admittedly weighty interest in the safe, effective operation of removal orders. *See Salerno*, 481 U.S. at 750.

In summary, and unlike in *Carlson* and *Demore*, the Government has made no showing that "Congress had before it evidence . . . sufficient to furnish reasonable ground for [this] action." *See Carlson*, 342 U.S. at 536; *see*

*also Lopez-Campos*, 175 F.4th at 733–34 (applying a similar rationale to Section 1226(a)). That does not make this law infirm, but it does at least mean the Government must show, at some point, that the individual aliens "present[] an identified and articulable threat to an individual or the community" or flight risk. *See Salerno*, 481 U.S. at 751.

Without a categorical justification for their detention, these aliens are entitled at some point to an individualized determination in the form of a bond hearing. The Fifth Amendment requires, at minimum, that there must be some reason for the Government to detain any person. The Supreme Court still allows for "necessary Executive leeway" before a hearing must be granted. *See Zadvydas*, 533 U.S. at 700. We now analyze how much leeway is permitted.

*IV. Procedure Required*

Having recognized that the Fifth Amendment protects resident aliens from unreasoned, indefinite detention, we next consider "the process that is constitutionally due" before aliens may be deprived of their liberty interests. *Mathews*, 424 U.S. at 322–33. *Mathews* provides three factors to aid in our review: 1) "the private interest that will be affected by the official action"; 2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

First, the private interest here "is the most elemental of liberty interests — the interest in being free from physical detention." *Hamdi*, 542 U.S. at 529. "It is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'" *Jones v. United States*, 463 U.S. 354, 361 (1983) (quoting *Addington v. Texas*,

441 U.S. 418, 425 (1979)). These aliens have a cognizable interest in being free from unjustified physical restraint.

Second, we must weigh the risk of an erroneous deprivation of that interest through the procedures used. This court has held that Section 1225(b)(2)(A) requires detention of all unadmitted aliens and provides no opportunity for review of that detention. *Buenrostro-Mendez*, 166 F.4th at 506. The Supreme Court has held that an alien's removable status itself, without more, is not a sufficiently strong special justification under the Constitution for indefinite detention. *Zadvydas*, 533 U.S. at 691–92.

Here, as long-time residents of this country with children who are citizens, there is no evidence that these individuals are a flight risk. We agree with them that "they all have a particularly strong incentive to appear at their removal proceedings due to their eligibility to obtain lawful permanent resident status in those proceedings through cancellation of removal." Likewise with dangerousness. They have no criminal background or history of violence and appear to have each peaceably lived in this country, obedient to its laws, for over a decade. The Government has provided no evidence that will change upon a conditional release.

Third, we consider the Government's interest. "[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Mezei*, 345 U.S. at 210). We agree with the Government that it has a powerful interest in the efficient and effective administration of federal immigration law. *See Landon*, 459 U.S. at 34. There also is little doubt that "[d]etention is necessarily a part of [the] deportation procedure." *Carlson*, 342 U.S. at 538. Aliens may be "detain[ed] for the brief period necessary for their removal proceedings." *Demore*, 538 U.S. at 513. JUSTICE KENNEDY was the necessary fifth vote for the majority opinion in *Demore*, but he

elaborated on his agreement with a separate concurring opinion, stating that after an "unreasonable delay," we must "inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness." *Id.* at 532 (KENNEDY, J., concurring).

Obviously, there are important interests in balance in this case. Our role is "limited to determining [what] procedures meet the essential standard of fairness under the Due Process Clause." *Landon*, 459 U.S. at 34–35. We must strike a "reasonable accommodation between legitimate competing concerns." *See County of Riverside v. McLaughlin*, 500 U.S. 44, 57–58 (1991). We conclude that the Due Process Clause requires the Government to provide a bond hearing to aliens held under Section 1225(b)(2)(A) within a reasonable time of detention.

To determine what is reasonable, once again we examine *Zadvydas* and *Demore*.

The *Zadvydas* Court determined it was "practically necessary to recognize some presumptively reasonable period of detention."[12] 533 U.S. at 701. We are bold but required to do the same. The needed presumption here is for when pre-removal-order, detained aliens who have not been

---

[12] The Court gave examples of presumptions for lower courts to apply:

> *See Cheff v. Schnackenberg*, 384 U.S. 373, 379–380, 86 S. Ct. 1523, 16 L. Ed. 2d 629 (1966) (plurality opinion) (adopting rule, based on definition of "petty offense" in United States Code, that right to jury trial extends to all cases in which sentence of six months or greater is imposed); *County of Riverside v. McLaughlin*, 500 U.S. 44, 56–58, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991) (O'CONNOR, J.) (adopting presumption, based on lower court estimate of time needed to process arrestee, that 48-hour delay in probable-cause hearing after arrest is reasonable, hence constitutionally permissible).

*Zadvydas*, 533 U.S. at 701.

convicted of any crime become entitled to contest their detention. "'[D]ue process is flexible,' . . . and it 'calls for such procedural protections as the particular situation demands.'" *Jennings*, 583 U.S. at 314 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The authorities we have discussed give a range of 90 days to 6 months.

In *Zadvydas*, the two aliens were subject to removal orders and had been denied bail on the basis of dangerousness by immigration authorities. *Id.* at 684–87. Their detention continued because no country to which they might be removed would accept them. *Id.* Some relevant background for the opinion's analysis is that Congress had mandated that the Attorney General "shall detain" every alien subject to a removal order for a 90-day removal period. 8 U.S.C. § 1231(a)(2)(A). In other words, these are aliens for which a final decision has been made that they have no right to be in this country. The *Zadvydas* Court weighed the Attorney General's use of an additional statutory authority to detain aliens determined to be "risk to the community or unlikely to comply with the order of removal" beyond that 90-day period. 533 U.S. at 682 (quoting 8 U.S.C. § 1231(a)(6)). The Court was not willing to limit a presumption of reasonableness for detention to the start of that additional period; it had "reason to believe . . . that Congress previously doubted the constitutionality of detention for more than six months." *Id.* at 701. As detailed above, the Court decided that six months after a removal order — or three additional months beyond the general mandate — to be the "period reasonably necessary to secure removal" before a bond hearing would be required. *Id.* at 699, 701.

Later, the *Demore* Court concluded that detention after a removal order has no obvious end-date, but detention while awaiting a decision on removal does, *i.e.*, the removal decision. *Demore*, 538 U.S. at 529. Of course, the three men seeking release from detention in this case are in the *Demore*

category of awaiting decisions on removal, but not in the category of having been convicted of any criminal offense.

We interpret *Demore* and *Zadvydas* as consistent with not permitting interminable detention of aliens either awaiting a decision on removal or in being removed. *See id.* at 529 (stating the importance of "a definite termination point" for detention). In removal proceedings there is a "theoretical" end point: the entry of a removal order. *See Lopez-Campos*, 175 F.4th at 734. But we agree with the Sixth Circuit insofar as it held that "detention without an individualized bond hearing can become constitutionally impermissible, even if the detention has a theoretical end point." *Id.* We believe that point comes after the passage of a reasonable time in which the Government may accomplish the initial custody, determine the individual risk of the alien, and effect removal. Of course, the legitimate reasons for delay in removal are not necessarily the same as the legitimate reasons for delay in deciding whether a removal order should be entered. Nonetheless, an alien's interests in liberty are largely indistinguishable in both situations even if the Government's interests vary.

We are left to determine the length of a presumptively reasonable time for the Government to determine whether aliens like these three should be removed. The *Demore* Court detailed the distinction with *Zadvydas* by discussing the Government's representations on how quickly removal proceedings reach a decision. The Court relied on the Government's briefing that, "in 85% of the cases in which aliens are detained pursuant to § 1226(c), removal proceedings are completed in an average time of 47 days and a median of 30 days." *Demore*, 538 U.S. at 529. The remaining cases took an average of four months. *Id.* The Court restated the holding of *Zadvydas* as "permitting aliens to be detained for several months prior to . . . a hearing" and noted the vast majority of cases occurred within the 90 days

"considered presumptively valid." *Id.* at 529 & n.11. Thus, the approval in *Demore* of detention was with this understanding.

Given the absence of any categorical justification for detention, unlike in *Zadvydas* (aliens who have been found to be removable) and *Demore* (aliens who were convicted of criminal offenses), there is no reason to lengthen the period of time during which the validity of detention can be presumed.[13] We conclude that the Government may detain aliens under Section 1225(b)(2)(A) for ninety days but no longer without a bond hearing. We described earlier the manner in which, by regulations, the Government had

---

[13] We acknowledge that in both *Demore* and *Zadvydas*, six months was another important period of time. Nonetheless, neither case provides an appropriate analogue to the detention mandate we are considering.

In *Zadvydas*, the Court interpreted a statute and not the breadth of the Due Process Clause. Moreover, the two aliens there had been adjudicated dangerous by immigration authorities. 533 U.S. at 684–87. One of the aliens had been determined to be a risk, for example, because "of his former gang membership, the nature of his crime, and his planned participation in a prison hunger strike." *Id.* at 685–86. Both had lengthy criminal records. *Id.* at 684–687. In *Zadvydas*, even the dissent agreed that "[g]iven the undeniable deprivation of liberty caused by the detention, there might be substantial questions concerning . . . the adequacy of judicial review in specific cases where it is alleged there is no justification for concluding an alien is dangerous or a flight risk." *Id.* at 725 (KENNEDY, J., dissenting). That is the question we confront in this case. The dearth of any evidence of dangerousness here, and the fact that removal proceedings are still ongoing makes *Zadvydas* a helpful, but not conclusive, guide.

*Demore* is more similar. The *Demore* Court reversed the petitioner's grant of habeas relief despite his having "spen[t] six months in INS custody." 538 U.S. at 510. We could take our presumption from that six-month figure. For the reasons already expressed, we conclude the statutory regime here is sharply distinguishable from Section 1226(c).

To summarize, in *Demore*, the Court described the Section 1226(c) detention regime as "narrow," "support[ed]" by "evidence," and tied to "'personal activity' that Congress considered relevant to future dangerousness.'" *Id.* at 525–529 & n.9. Section 1225(b)(2)(A) does not have those features. That difference at least leaves open the propriety of a commensurate difference in "procedural protections [that] the particular situation demands.'" *Jennings*, 583 U.S. at 314 (citation omitted). We hold that such a difference is proper.

made determinations on bond for individual detainees. *See* 8 C.F.R. § 1236.1(c)(8) (initial decision); 8 C.F.R. § 1003.19(d); 8 C.F.R. § 1236.1(d)(1); 8 C.F.R. § 1236.1(d)(3) (appeals). We are not ordering any particular process, and it is for the defendants to determine in what manner to provide such a hearing within those 90 days. Failure to provide timely hearings might again lead to the involvement of district courts. Our only requirement is that a hearing must be held within 90 days of the commencement of detention and that at the hearing, the Government must articulate an individualized justification for further detention without bond. Two such justifications already have judicial imprimatur — dangerousness and flight risk — but we do not reject the possibility that the Government may be able to assert another justification why an unadmitted alien must be detained.

We agree with the Government that the timing of two of the grants of *habeas* in the cases was precipitate but disagree as to the third. One of the aliens had been detained for about three weeks, one for two months, and the third for about four months. How should the error of too-early release be addressed? A key factor is that detention of both individuals was required, absent judicial intervention, until a removal order was entered. *See Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 228 (BIA 2025). No speculation is necessary. Further, the district court orders did not stay administrative proceedings for their removal. Therefore, today, if the orders we are reviewing had never been issued, these aliens would either have had a decision made as to their removal or would be detained while removal was still being considered. If still detained pre-removal, today's opinion would require their release unless they had been provided a bond hearing that denied release.

We have not been informed of any such developments. Regardless, we see no reason to have any of the three detained again to serve additional

time prior to a removal order. If a removal order has been issued as to any of these aliens, detention under Section 1225(b)(2)(A) is no longer relevant.

We therefore uphold these three grants of writs of *habeas corpus*.

To be clear, a bond hearing may determine that the individual alien is a danger or a flight risk and conclude that continued detention is required. Further, if a removal order is entered for any alien who has been released under our ruling, detention will again be required under Section 1231(a)(2)(A). Our decision does not apply to any alien held under Section 1226(c), or under any other statutory provision requiring detention without bond. In addition, the presumption of reasonableness of detention for ninety days applies to aliens such as the three before this court, who acknowledge they are properly being considered for removal.

AFFIRMED.

JAMES E. GRAVES, JR., *Circuit Judge*, specially concurring:

I fully concur with the majority's decision to affirm the district courts' *habeas* grants. I write separately to emphasize that Petitioners were entitled to due process from the moment the Government sought to deprive them of their liberty. And while I also concur in setting a 90-day time limit for hearings, I do so only because a 90-day time limit is better than no limit at all. In my view, the time limit should be shorter. I would require currently detained noncitizens to receive a hearing within 30 days of their detention. And noncitizens who will be detained in the future should receive pre-deprivation due process.

The real violation here is that Petitioners' continued detention was unjustified, not that it was indefinite.[1] *See Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or *unjustified* deprivation of life, liberty, or property." (emphasis added)). Of course, it was *also* indefinite and prolonged, which only exacerbated the offense. A six-month detention without a hearing violates the Constitution and the Supreme Court's time limit for reasonableness of detainment. *See Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) ("[F]or the sake of uniform administration in the federal courts, we recognize [a six-month] period" after which the government must justify post-removal-period confinement.). But unjustified detention, whether it is

[1] I distinguish here detention, which is prolonged physical restraint, from initial custody or arrest. As the Supreme Court explained it, there is a distinction between taking a noncitizen into custody and detaining him. For custody, "the Secretary of Homeland Security [is empowered] to arrest and hold an alien 'pending a decision on whether the alien is to be removed from the United States.'" *Nielsen v. Preap*, 586 U.S. 392, 397 (2019) (quoting 8 U.S.C. § 1226(a)). Detention is longer and stands in contrast to release on bond: "[T]he Secretary [has] the discretion *either* to detain the alien or to release him on bond or parole." *Id.* (emphasis added).

indefinite or not, runs afoul of the Due Process Clause. *See Demore v. Kim*, 538 U.S. 510, 557 (2003) (Souter, J., concurring in part and dissenting in part) ("In sum, due process requires a 'special justification' for physical detention that 'outweighs the individual's constitutionally protected interest in avoiding physical restraint' as well as 'adequate procedural protections.'" (quoting *Zadvydas*, 533 U.S. at 690–91)).

Noncitizens like Petitioners who are held under § 1225(b)(2)(A) should have their constitutional right vindicated as quickly as possible, and 90 days is an excessively long period of unexplained confinement. They have not been given any pre-deprivation justification for detention, as is usual under other statutory immigration provisions. Section 1226(a) is the statute which, until recently, applied to Petitioners. *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 500 (5th Cir. 2026). "Section 1226(a) sets out the default rule . . . . [T]he Attorney General 'may release' an alien detained under § 1226(a) 'on ...bond' or 'conditional parole.'" *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) (quoting 8 U.S.C. § 1226(a)). Under that provision, an immigration officer has the initial authority to decide whether to detain or release a noncitizen. 8 C.F.R. § 1236.1(c)(8). In the case of a warrantless arrest, a custody determination must be made within 48 hours. *Id.* § 287.3(d). If detained, the noncitizen can appeal to an immigration judge. *Id.* §§ 1236.1(d)(1), 1003.19(a). That decision can be appealed to the Board of Immigration Appeals. 8 C.F.R. § 1003.19(f).

Petitioners, and other similarly situated noncitizens, were not afforded any due process whatsoever, not even administrative proceedings. *Cf. Zadvydas*, 533 U.S. at 692 ("[T]he sole procedural protections available to the alien are found in administrative proceedings . . . . This Court has suggested, however, that the Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights." (citation modified)). Prolonged detention

without any due process is constitutionally impermissible. As I see it, prudence dictates that—for noncitizens residing in the interior of the United States who have already been detained under the new interpretation of § 1225(b)(2)(A)—courts must convene a hearing to establish whether the noncitizen is either dangerous or a flight risk no more than 30 days after their initial detention.[2]

I would also hold that, effective immediately, any noncitizens arrested under the statute must receive the pre-detention due process previously available under § 1226(a). A pre-deprivation hearing is required under the Due Process Clause. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950))); *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70 (1972) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount."). The lack of pre-deprivation due process may only be permissible in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). Even so, a "full hearing must be available *promptly* after the temporary deprivation occurs." *Barry v. Barchi*, 443 U.S. 55, 72 (1979) (Brennan, J., concurring

[2] The district courts in our circuit that have ordered hearings instead of immediate release have required an even shorter timeline. *Gomes v. Garite*, No. EP-25-CV-00663-DCG, 2026 WL 1179617, at *10 (W.D. Tex. Apr. 21, 2026) (ordering a bond hearing within seven days of the order, with 24-hour notification); *Lopez-Arevelo v. Ripa*, 801 F. Supp. 3d 668, 688 (W.D. Tex. 2025) (same).

in part). The Government has not shown that we have an "extraordinary situation" on our hands that would justify postponing a hearing, especially considering that pre-detention determinations have been afforded to noncitizens for years under § 1226(a). And in situations where a noncitizen is given a hearing and is subsequently detained, they have a right to another hearing to show that removal proceedings may not be forthcoming and their detention is indefinite. *See Zadvydas*, 533 U.S. at 701.

I disagree with the majority's comment that the timing of two of the *habeas* grants was precipitate. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Because the Government seeks to deprive noncitizens of their liberty, the "meaningful time" to justify the deprivation is as soon as possible.

* * *

There is much that could be said about the troubling conditions noncitizens are currently experiencing, in what amounts to an appalling lack of humanity shown to our fellow human beings. It bears repeating that Petitioners, and others in their situation, have lived in the United States for many years; they started families, raised children, and contributed to their communities as peaceable members of our society. They were abruptly taken from their homes and placed in detention centers without explanation or a timeline for future immigration proceedings. Thousands of others face the same fate—and the Government's detention policy has placed great strain on our courts and immigration system. But procedural due process "yields less to the times, varies less with conditions, and defers much less to legislative judgment." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 224 (1953) (JACKSON, J., dissenting). We must be uncompromising in

our consistent administration of procedural fairness, for "[n]o society is free where government makes one person's liberty depend upon the arbitrary will of another." *Id.* at 217 (Black, J., dissenting).

Cory T. Wilson, *Circuit Judge*, dissenting:

I would vacate the district courts' grants of habeas relief in these cases. Petitioners were not entitled to challenge their detention under 8 U.S.C. § 1225(b)(2)(A) on procedural due process grounds, and even if they were, the hearings they request are wholly irrelevant to their detention under that statute. Congress's decision embodied in § 1225(b)(2)(A) categorically to detain aliens in Petitioners' posture pending removal proceedings was constitutionally sound. And the length of Petitioners' detention presented no constitutional defects justifying habeas relief.

Practically speaking, the panel majority frames a stark binary in these cases: Either we must mandate what will rapidly devolve to immediate release of alien detainees absent immediate, extra-statutory individualized bond hearings (on factors and timelines the majority leaves somewhat TBD), or we risk "ignoring the Constitution." *Ante*, at 4. But in its earnestness to keep Petitioners out of custody, the majority marginalizes the Constitution's express grant of plenary authority over immigration matters to Congress—indeed, Judge Graves would go even further and override not just the Legislature's prerogative but also the Executive's enforcement discretion, mandating that the Administration ignore § 1225(b)(2)(A) and apply § 1226(a). *Ante*, at 40, 41 (Graves, J., concurring).

At bottom, the panel majority, like the district courts before it, invents a nebulous rule that has no administrable limits and little consistency with, in my reading at least, applicable precedent or the Constitution. Today's decision deputizes every district court in our circuit to refashion the removal process as it sees fit, inviting even more chaos into our circuit's overwhelmed immigration dockets. And it unleashes this mischief while admitting that, even under its confected standard, at least two of the three Petitioners' habeas claims should have been denied by the district courts. But then it

affirms anyway, given the conjecture that Petitioners, by now, would have been detained for too long. With greatest regard for my esteemed and thoughtful panel colleagues, I respectfully, but emphatically, dissent.

## I.

The statute at the center of this appeal is the product of a lengthy effort by Congress to curb illegal immigration into the United States. Before 1996, federal immigration law treated aliens differently depending on whether an alien presented himself at a port of entry or simply entered illegally into the United States. *See, e.g.*, 8 U.S.C. §§ 1225(a), 1251(a) (1994). Under this older framework, an alien's physical entry into the country controlled what removal proceedings applied and whether an alien would be detained during those proceedings. *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 498 (5th Cir. 2026). Aliens who arrived at a port of entry were subject to mandatory detention during their exclusion proceedings, while aliens who evaded inspection and entered the country illegally were entitled to request release on bond while deportation proceedings were pending. *Id.* Over time, this statutory scheme produced the "unintended and undesirable consequence" of allowing illegal entrants to "take advantage of . . . greater procedural and substantive rights afforded in deportation hearings" than those who properly presented themselves to authorities at a port of entry. *Martinez v. Holder*, 693 F.3d 408, 413 n.5 (3d Cir. 2012).

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which "aimed to reduce this incongruity." *Buenrostro-Mendez*, 166 F.4th at 499; *see* Pub. L. 104-208, 110 Stat. 3009 (Sept. 30, 1996). IIRIRA aimed to "ensure[] that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA." *Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (en banc). To that

end, IIRIRA established one set of removal procedures for aliens who have been "admitted" to the United States and another for those who have not.

In July 2025, the Department of Homeland Security "revisited its legal position on detention and release authorities." Immigr. & Customs Enf't, Interim Guidance Regarding Detention Authority for Applications for Admission (July 8, 2025), https://perma.cc/2V6H-FHVD. The agency determined that "applicants for admission," including aliens apprehended in the interior, "are subject to detention under [8 U.S.C. § 1225(b)(2)(A)] and may not be released from ICE custody except by [discretionary] parole." *Id.* Thus, unlike "aliens admitted to the United States and chargeable with deportability," applicants for admission are not "eligible for a custody determination and release on recognizance, bond, or other conditions[.]" *Id.* This understanding has since been adopted by the Board of Immigration Appeals. *See In re Yajure Hurtado*, 29 I. & N. Dec. 216, 228 (B.I.A. 2025).

Earlier this year, our court affirmed that the term "applicants for admission" under § 1225 extends to aliens residing in the United States who have never been lawfully admitted to the country. *See Buenrostro-Mendez*, 166 F.4th at 506–07; *see also Avila v. Bondi*, 170 F.4th 1128, 1133 (8th Cir. 2026) (same). In *Buenrostro-Mendez*, this court upheld the mandatory detention of "applicants for admission" under § 1225(b)(2)(A), noting that the provision does not "say[] anything whatsoever about bond hearings." 166 F.4th at 502 (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018)). This reading harmonizes the treatment of unadmitted aliens regardless of their entry into the country, best aligns with the statutory text, and "better honors [the] predominant goal in the enactment of IIRIRA." *Id.* at 508.

## II.

With this statutory framework and precedent in mind, I turn to Petitioners' habeas claims. Petitioners do not dispute that they are

"applicants for admission" and subject to mandatory detention pending their removal proceedings under § 1225(b)(2)(A). But Petitioners urge that their detention without a bond hearing during their removal proceedings violates their rights under the Fifth Amendment's Due Process Clause, even if § 1225(b)(2)(A) does not require any such hearing before imposing detention. I disagree.

**A.**

The district courts treated Petitioners' claims as assertions of a right to procedural due process, a framing which Petitioners reurge on appeal. A procedural due process challenge asserts only that "the established state procedure . . . destroys [a plaintiff's] entitlement *without according him proper procedural safeguards*." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (emphasis added) (quotation marks omitted). Thus, Petitioners' procedural due process challenge is not an assertion that Congress lacks the power to detain illegal aliens such as themselves, but only that the procedure they received was insufficient to justify that detention.

In assessing Petitioners' claims, the district courts applied the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which

> generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335 (citation omitted). The district courts concluded that Petitioners' liberty interest in physical freedom was profound and that an appreciable risk of erroneous detention could be negated by bond hearings on Petitioners'

dangerousness and flight risk. Waving aside the Government's interest in ensuring prompt removal of illegal aliens following their removal proceedings, the district courts found that the *Mathews* factors clearly favored Petitioners, such that their continued detention absent such bond hearings was unconstitutional.

At the outset, I readily agree with my panel colleagues that Petitioners enjoy the protections of the Fifth Amendment. *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). JUDGE SOUTHWICK's lead opinion goes to some length to express this conclusion. *Ante*, at 8–12. And I agree that certain rights "cannot be deprived except pursuant to constitutionally adequate procedures." *Id.* at 16 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)). But the issue in this case is not *whether* Petitioners are entitled to due process, but what *specific* process is due for unadmitted aliens in their removal proceedings—bearing in mind that Congress enjoys "broad power over naturalization and immigration" and "regularly makes rules that would be unacceptable if applied to citizens." *Diaz*, 426 U.S. at 79–80.

The answer to that question is straightforward: Because Petitioners have never been admitted to the United States, due process does not entitle them to additional proceedings beyond what Congress has provided before they may be detained pending removal. And even granting that such a challenge is possible, the facts Petitioners seek to prove at their bond hearings are irrelevant to detention under § 1225(b)(2)(A), such that the absence of those hearings did not render their detention constitutionally defective. It was thus error to grant habeas relief on procedural due process grounds.

**1.**

Aliens seeking admission to the United States have only a limited ability to challenge their admission process on constitutional grounds. In *D.H.S. v. Thuraissigiam*, 591 U.S. 103 (2020), the Supreme Court recognized

that "the Constitution gives [Congress] plenary authority to decide which aliens to admit and a concomitant . . . power to set the procedures to be followed in determining whether an alien should be admitted." *Id.* at 139. When "foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, *nor even been admitted into the country pursuant to law*" interact with those procedures, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law." *Id.* at 138 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)) (emphasis added).

The majority hooks on that middle phrase, "nor acquired any domicil or residence within the United States," *id.*, to maintain that illegal aliens "with an established presence" in the country may challenge the admission process, whereas those turned back at the border may not. *Ante*, at 14. But this cabined reading ignores the thrust of the decision, which bears directly on the scope and operation of § 1225(b)(2)(A). First, the Court clarified that "an alien who . . . is treated as an 'applicant for admission'" "has only those rights regarding admission that Congress has provided by statute." *Thuraissigiam*, 591 U.S. at 140 (quoting 8 U.S.C. § 1225(a)(1)); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."). Regardless of their physical entry into the nation's interior, it is undisputed that Petitioners are "applicants for admission" under § 1225(b)(2)(A) and *Thuraissigiam*, as our recent precedent makes clear. *See Buenrostro-Mendez*, 166 F.4th at 499 ("Following the passage of IIRIRA[,] an alien's status as an applicant for admission does not turn on where or how the alien entered the United States."); *id.* at 502 ("The petitioners are deemed, by statute, to be applicants for admission pending the resolution of removal proceedings.").

Nevertheless, the majority suggests *Thuraissigiam* "confirms the continuing relevance of [the] physical presence requirement, distinguishing those who have 'acquired any domicil or residence within the United States' from those who have not." *Ante*, at 14 (quoting *Thuraissigiam*, 591 U.S. at 138). Not so: *Thuraissigiam* repeatedly emphasizes that admission status—not physical presence—determines what procedural rights are available to an alien. *See* 591 U.S. at 139 (dismissing presence-based distinctions as "meaningless"). The Court plainly concluded that an "applicant for admission," like an "alien who is detained shortly after unlawful entry[,] cannot be said to have effected an entry." *Id.* at 140 (quotation omitted). Underscoring this principle, the Court added that "even those [aliens] paroled elsewhere in the country for years pending removal" must be "treated for due process purposes as if stopped at the border." *Id.* (quotation omitted); *see also Yajure Hurtado*, 29 I. & N. Dec. at 228 ("Remaining in the United States for a lengthy period of time following entry without inspection, by itself, does not constitute an 'admission.'") (citing 8 U.S.C. § 1101(a)(13)(A)).

Moreover, *Thuraissigiam* explains straightforwardly that "the reason" for historic distinctions based on entry rested on the "plenary authority" entrusted to Congress in "set[ting] the procedures to be followed in determining whether an alien should be admitted." 591 U.S. at 139. Historically, Congress had made an alien's entry the touchstone for what process adhered in removal proceedings. *See, e.g.*, 8 U.S.C. §§ 1225(a), 1251(a) (1994). But since Congress passed IIRIRA, it is an alien's admission status, not his physical presence, that determines the content of an alien's admission proceedings. *See Thuraissigiam*, 591 U.S. at 140 (quoting 8 U.S.C. § 1225(a)(1)); *Vartelas v. Holder*, 566 U.S. 257, 262 (2012) ("In IIRIRA, Congress . . . made 'admission' the key word" in deciding what process an alien received. (citation omitted)). Far from breaking new ground, this

understanding accords with established precedent instructing that only "once an alien *gains admission* to our country and begins to develop the ties that go with permanent residence [does] his constitutional status change[] accordingly." *Plasencia*, 459 U.S. at 32 (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)) (emphasis added). Petitioners have never been admitted to the United States, so their "constitutional status" with regard to their admission proceedings has never changed. *Id.*

The majority insists that such a reading of *Thuraissigiam* would implicitly overrule other venerable Supreme Court precedent tying the scope of an alien's procedural rights in the removal context to their physical presence in the country. *Ante*, at 9–15. But the cases the majority cites as confirmation of this view are, with greatest respect, uniformly inapt.

First, the majority cites *Yamataya v. Fisher*, 189 U.S. 86 (1903), for the proposition that an illegal immigrant must receive "all opportunity to be heard upon the questions involving his right to be and remain in the United States[.]" *Ante*, at 10 (quoting *Yamataya*, 189 U.S. at 101). But *Yamataya* concerns only what due process requires with regard to removability itself. Petitioners concede that they are not entitled to admission, so *Yamataya* has no bearing on whether they may challenge the detention Congress has prescribed as their removal process is ongoing. To the contrary, *Yamataya* cites as a "firmly established" principle that "Congress may . . . establish regulations for sending out of the country such aliens as come here in violation of the law [and] commit the enforcement of such provisions, conditions, and regulations exclusively to executive officers, without judicial intervention[.]" 189 U.S. at 97. The *Yamataya* Court concluded that the statute in question did not "necessarily exclude opportunity [for] the immigrant to be heard" and thus an additional hearing on the alien's removability would remove any constitutional doubt as to her treatment. *See id.* at 100–02. By contrast, Congress made clear in § 1225(b)(2)(A) that

applicants for admission, as Petitioners unquestionably are, are to be detained after an immigration officer "determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Unlike the alien in *Yamataya*, Petitioners do not challenge the determination that leads to their detention; they insist instead that additional hearings must be layered on top of the statute even after their status as "applicants for admission" is clear. Again, not so. Put plainly, Petitioners' due process *is* § 1225(b)(2)(A), and that statute does not entitle them to a bond hearing. *See Buenrostro-Mendez*, 166 F.4th at 502.

Next, the majority cites *Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206 (1953), for the notion that "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Id.* at 212. True as this may be, nothing in *Mezei* supports the conclusion that illegal aliens may not be detained pending removal proceedings absent hearings that Congress never ordained. *Mezei* concerned an alien who had resided lawfully in the United States for twenty-five years but was excluded upon his return from Eastern Europe, resulting in a lengthy detention as authorities attempted to deport him. *Id.* at 208–09. Mezei's legal presence in the United States did not afford him any additional rights entitling him to reenter his adoptive homeland. "For purposes of the immigration laws[,] the legal incidents of alien's entry remain unaltered whether he has been here once before or not. He is an entering alien just the same, and may be excluded if unqualified for admission under existing immigration laws." *Id.* at 213. Ultimately, the court concluded that Mezei's continued detention without hearing was constitutional. *Id.* at 214–16. The Court reiterated that "the power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by [Congress] largely immune from judicial control." *Id.* at 210. If Congress may exclude a returning lawful resident and detain him without

hearing pending his removal, reading *Thuraissigiam* to respect the will of Congress and harmonize the treatment of aliens who have never been lawfully admitted is hardly an inventive or arcane interpretation.

Last, the majority relies on *Plyler v. Doe*, 457 U.S. 202 (1982), to express that a "territorial" theme is "omnipresent in immigration jurisprudence." *Ante*, at 9. On the majority's reading, *Plyler* commands that illegal resident aliens and lawful resident aliens must be treated equally for due process purposes. *Id.* at 9, 11. But *Plyler* did not primarily concern due process, nor did it touch on Congress's power over removal proceedings at all. Instead, *Plyler* contemplated only whether the Equal Protection Clause required Texas schools to fund the education of the children of illegal aliens. 457 U.S. at 206–09. Accepting that *Thuraissigiam* constrains the due process rights of illegal aliens with regard to their removal proceedings does no damage to *Plyler* at all.

The Supreme Court "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). Yet by ignoring *Thuraissigiam*'s instruction that unadmitted aliens are limited to the admission procedures that Congress provides, the district courts in these cases, now endorsed by my panel colleagues, reintroduced the very procedural backwardness that Congress sought to resolve in enacting IIRIRA. Manifestly, IIRIRA "aimed to reduce [the] incongruity" whereby "greater procedural and substantive rights" were afforded to "aliens who bypassed entry procedures" than to those who endeavored to follow lawful procedures at their initial entry. *Buenrostro-Mendez*, 166 F.4th at 498–99. The district courts were not free to arrogate Congress's prerogative and simply engraft the pre-1996 regime and the perverse incentives it created back into IIRIRA by invoking the Due Process Clause. Nor is this court.

In sum, Petitioners concede that they are "applicants for admission" within the meaning of § 1225, regardless of their lengthy residence in the country. And because Petitioners have never been lawfully admitted into the United States, the admission procedures provided by Congress in § 1225(b)(2)(A) embody the due process to which they are entitled. *See Thuraissigiam*, 591 U.S. at 139–40. That process does not include a bond hearing. *Buenrostro-Mendez*, 166 F.4th at 502. Imposing one *ultra vires* of the statute, on the basis that Petitioners successfully entered the country by evading inspection or admission, traverses both *Thuraissigiam* and the sovereign choice of Congress to rectify that very asymmetry in IIRIRA. *See Thuraissigiam*, 591 U.S. at 139; *accord Jennings*, 583 U.S. at 303 (The language of "§ 1226(c) reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute."); *Wekesa v. U.S. Att'y*, No. 22-10260, 2022 WL 17175818, at *1 (5th Cir. Nov. 22, 2022) (Southwick, J.) (detention without bond hearing pending removal under § 1226(c) did not violate a habeas petitioner's due process rights).

Irrespective of my sympathy for the plight in which Petitioners find themselves, I cannot conclude that their detention in accordance with § 1225(b)(2)(A), without a bond hearing, offends due process under the Constitution. Petitioners have received the process that was due to unadmitted aliens, and granting habeas relief based on the district courts' contrary conclusion was erroneous.

**2.**

Even if Petitioners could challenge the process leading to their detention pending removal, their claims would still fail because procedural due process does not require bond hearings centered on assessing dangerousness and flight risk in the context of § 1225(b)(2)(A).

"In *Mathews v. Eldridge*, the Court set forth [the] factors that normally determine whether an individual has received the 'process' that the Constitution finds 'due.'" *City of Los Angeles v. David*, 538 U.S. 715, 716 (2003). But "[p]laintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant *under the statutory scheme*." *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 8 (2003) (emphasis added). Here, they are not.

Contrary to my panel colleagues' take (the district courts altogether marginalized the case), *Doe* illustrates this principle well. In *Doe*, a convicted sex offender asserted a right to a hearing on his individual dangerousness before being forced to register as a sex offender. *Id.* at 6. The Court rejected his challenge, holding that the respondent's dangerousness was "of no consequence" to the statute, which required registration of *all* convicted sex offenders without reference to individual dangerousness. *Id.* at 7; *see also Duarte v. City of Lewisville*, 858 F.3d 348, 352 (5th Cir. 2017) (rejecting a procedural due process challenge where a showing of dangerousness was "of no consequence" to proscription under a zoning ordinance (quoting *Doe*, 538 U.S. at 7)). Justice Scalia's concurrence in *Doe* elucidates that many statutes, by their nature, may only be challenged on the grounds of *substantive*, rather than *procedural*, due process:

> [E]ven if the requirements of [a] law implicate a liberty interest[,] the categorical abrogation of that liberty interest by a validly enacted statute suffices to provide all the process that is "due"—just as a state law providing that no one under the age of 16 may operate a motor vehicle suffices to abrogate that liberty interest. Absent a claim . . . that the liberty interest in question is so fundamental as to implicate so-called "substantive" due process, *a properly enacted law can eliminate it.* That is ultimately why, as the Court's opinion demonstrates, a convicted sex offender has no more right to additional "process" enabling him to establish that he is not

> dangerous than . . . a 15-year-old has a right to "process" enabling him to establish that he is a safe driver.

*Doe*, 538 U.S. at 8–9 (Scalia, J., concurring) (emphasis added); *see also id.* at 8 (majority opinion) (Doe's claim was a substantive due process claim "recast in procedural due process terms." (quotation omitted)).

While the statutory scheme considered in *Doe* differs from the immigration law at issue here, *Doe* highlights the problem with Petitioners' claims. Just as the statute in *Doe* mandated registration for sex offenders without any hearing on individual dangerousness, 8 U.S.C. § 1225(b)(2)(A) mandates detention for "an applicant for admission, if the examining immigration officer determines that [the alien] is not clearly and beyond a doubt entitled to be admitted," with no reference to an alien's individual dangerousness or flight risk. An alien is either "clearly and beyond a doubt entitled to be admitted" or not. If not, he may be detained pending removal proceedings. *Id.*; *see also Buenrostro-Mendez*, 166 F.4th at 502. Petitioners do not assert that the process they received was insufficient to prove that they are "entitled to be admitted"; thus, any determinations made at the bond hearings imposed by the district courts would be irrelevant to the lawfulness of Petitioners' detention under § 1225(b)(2)(A). *See Buenrostro-Mendez*, 166 F.4th at 502; *accord Jennings*, 583 U.S. at 307–12 (concluding that the text of § 1225 cannot be read to require bond hearings on the propriety of release).

The majority distinguishes *Doe* by reasoning that "[d]angerousness . . . had no relevance to [Doe's] constitutional claim, as he did not assert that dangerousness had any bearing on the Government's authority to require registration of those convicted of crimes." *Ante*, at 17. This observation misses the point twice over. First, a challenge to the Government's authority to detain Petitioners on the basis of their illegal presence, without reference to the procedure offered, is a substantive due process challenge, not a

procedural one. Second, if dangerousness was irrelevant to Doe's constitutional claims under the Connecticut law at issue in his case, it is equally irrelevant to Petitioners' procedural due process claim under § 1225(b)(2)(A). If illegal aliens may be constitutionally detained pending their removal proceedings under § 1225(b)(2)(A), the only relevant inquiry is whether Petitioners are "entitled to be admitted" or not.

In weighing the *Mathews* factors, *Doe* indicates what the proper result should be. Granting that § 1225(b)(2)(A) deprives the Petitioners of an important liberty interest, there is *no* risk of "erroneous deprivation" of that interest that would be cured by hearings on dangerousness or flight risk. Neither factor has any bearing on whether Petitioners are "entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A); *Mathews*, 424 U.S. at 335. Indeed, hearings on Petitioners' family connections in the United States, or their earning potential, or whether they drive American-made automobiles would be just as relevant to whether they may be detained under § 1225(b)(2)(A). Which is to say not relevant at all. The majority's *Mathews* analysis, like the district courts', ignores this disconnect entirely. *Ante*, at 31–33.

This mismatch is brought into sharp relief by the fact that neither the majority, nor the district courts, nor the Petitioners cite any authority indicating the need for individual bond hearings pending removal proceedings, much less under § 1225(b)(2)(A) in particular. At most, the panel majority offers that limiting aliens' dangerousness or flight risk is a central justification for detention. *Ante*, at 22–31. But they cite no authority suggesting the Government may *only* detain aliens pending removal when such risks are established via individual hearings. Indeed, the Supreme Court has repeatedly made clear that Congress may mandate detention for certain classes of alien *without* individual determinations of the type Petitioners seek. *See Demore v. Kim*, 538 U.S. 510, 513 n.1, 518, 525–28 (2003); *see also id.* at 523, 525 ("[T]his Court has recognized detention during deportation

proceedings as a constitutionally valid aspect of the deportation process," even where "[t]here [is] no 'individualized finding' of likely future dangerousness[.]" (quoting *Carlson v. Landon*, 342 U.S. 524, 543 (1952) (citation modified)); *Reno v. Flores*, 507 U.S. 292, 314 n.9 (1993) (rejecting the call for "fully individualized custody determinations").

The majority reduces *Doe*'s holding to the proposition "that when a statute that abrogates a claimed liberty interest does not substantively violate the Constitution, the Due Process Clause does not impose any additional procedural protection." *Ante*, at 18. In other words, per the majority, *Doe* has no currency here because the physical liberty interest asserted by Petitioners is more fundamental than Doe's reputational interest. *Id.* at 16–18.

This reading blurs the distinction between procedural and substantive challenges and cannot cure the problem with Petitioners' claims. True enough, *Doe* does not answer whether Congress may categorically detain aliens pending removal as a matter of substantive due process, but the majority ignores the clear import of *Doe*—that procedural "due process does not entitle [Petitioners] to a hearing to establish a fact that is not material under [the] statute." 538 U.S. at 7. And while the significance of Petitioners' liberty interest might be germane in weighing what procedural due process requires, *see Mathews*, 424 U.S. at 335, hearings irrelevant to the function of § 1225(b)(2)(A) are not constitutionally required, even if the statute impinges on a liberty interest. *See Doe*, 538 U.S. at 8–9 (Scalia, J., concurring).

At bottom, the district courts erred in their *Mathews* analysis by failing to address how bond hearings on dangerousness or flight risk could be relevant to Petitioners' classification as "applicants for admission," which Petitioners do not contest, and their resultant detention under

§ 1225(b)(2)(A). Because the proposed hearings would be irrelevant to those determinations, the lack of hearings did not render Petitioners' detention unconstitutional as a matter of procedural due process. The district courts erred in granting habeas relief based on the denial of process not due.

### B.

Because the district courts' conclusion that procedural due process entitled Petitioners to additional hearings was erroneous, this court could reverse and vacate the grants of habeas on the basis of that error alone. However, because Petitioners' challenges "call[] into question not the adequacy of procedures [employed] but . . . the adequacy of the 'fit' between the classification and the policy that the classification serves," their claims "must ultimately be analyzed . . . as a matter of substantive due process." *Michael H. v. Gerald D.*, 491 U.S. 110, 121 (1989) (plurality opinion).

Petitioners concede that they are "applicants for admission," and thus are subject to mandatory detention under § 1225(b)(2)(A). They nonetheless assert that Congress may not detain them without individualized findings on their dangerousness and flight risk.[1] Put differently, Petitioners' procedural due process claims largely collapse into substantive due process

---

[1] I hasten to add that Petitioners do not explain how their situations differ from those of other aliens detainable under § 1225(b)(2)(A). So, if Petitioners may only be detained after the Government proves their individual dangerousness or flight risk, then all aliens detained under the statute would be entitled to individualized hearings on those considerations, even though the statutory text attaches no weight to either factor. The majority insists that its ruling today "does not make [§ 1225(b)(2)(A)] infirm," even though its holding expressly requires that judicially imposed standards must be tacked on to the text of the statute before it may be lawfully enforced. *Ante*, at 31. It should be clear that Petitioners' substantive due process claim, now approved by my panel colleagues, is tantamount to a facial challenge to § 1225(b)(2)(A), not an as-applied challenge based on their own treatment. *See Freedom Path, Inc. v. I.R.S.*, 913 F.3d 503, 508 (5th Cir. 2019) ("[A] facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." (quotation omitted)).

because they assert a right to procedure that is absent from the statutory text. To prevail on a substantive due process claim, Petitioners must show (1) that they have a protected interest in freedom from custody even after conceding that they are not entitled to admission to the United States; and (2) Congress may not categorically detain them on the basis of their unadmitted status.

**1.**

As a threshold matter, I am unconvinced that Petitioners may assert an unqualified interest in physical liberty as my panel colleagues describe it. *Ante*, at 20. The Supreme Court has instructed that analyzing substantive due process claims requires a "careful description of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quotation omitted).[2] Petitioners concede that they have no right to admission, and thus a more precise description of the right they assert is the right to freedom from custody pending removal proceedings. *Cf. Dep't of State v. Muñoz*, 602 U.S. 899, 909–11 (2024) (recasting a petitioner's asserted "right to liberty" or "right to marriage" as a narrower right to the admission of a noncitizen spouse). On this view, Petitioners thus seek to vindicate what is an unenumerated right. And "[i]dentifying unenumerated rights carries a serious risk of judicial overreach," meriting "utmost care whenever [courts] are asked to break new ground in this field." *Id.* at 910. "Our Nation's history, legal traditions, and practices . . . provide the crucial guideposts for responsible decisionmaking that direct and restrain our

[2] The panel majority dismisses *Glucksberg* as inapposite, concluding that because a straightforward physical liberty interest is involved, no further analysis of the substantive due process right itself is necessary. *Ante*, at 20, 21. This will be news to Petitioners, who lead their substantive due process argument with *Glucksberg*. In my estimation, there is no way to avoid the conclusion that Petitioners' claims are ultimately "a substantive challenge to [8 U.S.C. § 1225(b)(2)(A)] recast in 'procedural due process' terms." *Doe*, 538 U.S. at 8 (cleaned up).

exposition of the Due Process Clause." *Glucksberg*, 521 U.S. at 721 (quotation omitted).

Any assertion of a fundamental right to freedom from custody pending removal proceedings fails. "[P]rior to 1907 there was no provision permitting bail for *any* aliens during the pendency of their deportation proceedings." *Demore*, 538 U.S. at 523 n.7 (citing Immigration Act of 1907, Pub. L. 59-96, 34 Stat. 898, 905 (Feb. 20, 1907)). Similarly, the 1952 amendments establishing the modern alien inspection process required detention pending inquiries into an alien's admissibility, with no provision for bond hearings or release on bail. *See* Immigration & Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163, 198–99 (June 27, 1952). And even where release on bail was permitted for some excludable aliens prior to IIRIRA, the availability of release was entrusted to the discretion of the Attorney General. *See id.* at 202; 8 U.S.C. § 1252(a)(1) (1994). Thus, any right to seek release pending removal proceedings is not "objectively, deeply rooted in this Nation's history and tradition" and cannot be a substantive due process right. *Glucksberg*, 521 U.S. at 721; *accord Muñoz*, 602 U.S. at 910 (holding that a citizen had no substantive due process right to the admission of a noncitizen spouse as such protections had never been consistently offered by federal immigration law).

Petitioners proffer little persuasive evidence to the contrary. At most, they assert that pre-adjudication release by federal courts or immigration authorities has historically existed in practice, even if the right to seek release was not formally encoded in federal law. *See* Lindsay Nash, *Resurrecting Immigration Releases*, 135 YALE L.J. 1533, 1586–90 (2026). But even granting that release was afforded to some immigrants at agency discretion, federal immigration law explicitly addressing aliens who have never lawfully entered the country has consistently required detention pending removal. *See* 66 Stat. at 198–99 (Immigration & Nationality Act of 1952); 110 Stat.

3009-582 (IIRIRA). And even if federal legal tradition and practice could be viewed to imply a consistent right of those aliens to request release on bond, Congress would retain "plenary authority to decide which aliens to admit and . . . to set the procedures to be followed in determining whether an alien should be admitted[.]" *Thuraissigiam*, 591 U.S. at 139. In other words, even if Congress intermittently granted unadmitted aliens a right to seek release, "such solicitude is 'a matter of legislative grace rather than fundamental right,'" *Muñoz*, 602 U.S. at 916 (quoting *Kerry v. Din*, 576 U.S. 86, 97 (2015)), and Congress could reform the admission process—as IIRIRA did—without affecting an unadmitted alien's fundamental rights.

If Petitioners have no substantive due process right to freedom from custody pending removal proceedings, their detention is subject only to rational-basis review. *Glucksberg*, 521 U.S. at 728. Under this standard, detention pursuant to § 1225(b)(2)(A) is permissible so long as it is "rationally related to legitimate government interests." *Id.*

Petitioners' detention easily clears this bar. Congress enjoys "broad power over naturalization and immigration" and "regularly makes rules that would be unacceptable if applied to citizens." *Diaz*, 426 U.S. at 79–80. More pointedly, "[d]etention during removal proceedings is a constitutionally permissible part of that process," and "the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Demore*, 538 U.S. at 526, 531. As the Supreme Court long ago noted, "deportation proceedings 'would be in vain if those accused could not be held in custody pending the inquiry into their true character.'" *Id.* at 523 (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). Petitioners' detention pending removal proceedings did not violate any substantive due process right, and habeas relief is inappropriate under such a theory.

**2.**

Assuming *arguendo* that Petitioners may seek to vindicate an unqualified interest in physical liberty, even after conceding that they are not entitled to lawful admission into the country, Petitioners would need to demonstrate that the substantive determinations leading to detention under § 1225(b)(2)(A) are inadequate to justify detention "*at all*, no matter what process is provided." *Flores*, 507 U.S. at 302. Such a claim must fail.

The panel majority leans on *Zadvydas v. Davis*, 533 U.S. 678 (2001), for the conclusion that "dangerousness and flight risk [are] special justifications for detention in[] immigration proceedings." *Ante*, at 22. Surveying Supreme Court precedent, the majority discerns that "'an alien's removable status[,] which bears no relation to [his] dangerousness' [cannot] justify detention." *Id.* at 23 (quoting *Zadvydas*, 533 U.S. at 691–92). Thus, reasons the majority, Congress cannot categorically require no-bail detention for aliens without sufficient evidentiary support suggesting that certain categories of aliens present either a danger to the community or a flight risk. *Id.* at 23–28. The majority then concludes that Congress has not met this evidentiary burden with regard to unadmitted aliens generally, and that these attributes may not be imputed to Petitioners absent individualized hearings. *Id.* at 28–31.

The majority's surmise that aliens may not be detained based on their illegal entry status alone is in tension with the Supreme Court's "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Demore*, 538 U.S. at 526; *see id.* at 511 ("Detention during [deportation] proceedings is . . . constitutionally valid."); *id.* at 528 (Detention pending removal proceedings "necessarily serves the purpose of preventing [aliens] from fleeing prior to or during their removal proceedings,

thus increasing the chance that, if ordered removed, the aliens will be successfully removed."); *see also Monsalvo v. Bondi*, 604 U.S. 712, 714 (2025) ("Often, the government may detain and deport an individual after properly determining he is unlawfully present in the country."). And the cases cited by the majority supply no straightforward support for their position.

In *Zadvydas*, the Court merely stated that "indefinite detention" of a lawfully present removable alien might present constitutional difficulties if the alien's ultimate removal was infeasible. 533 U.S. at 690–92. That is not the situation before us, as I discuss shortly. Likewise, *Carlson* considered lawful resident aliens whose Communist activism rendered them deportable, and the Court there merely stated that "purpose to injure [i.e., dangerousness] could not be imputed generally to all aliens subject to deportation." *Carlson*, 342 U.S. at 538. This observation has no bearing on whether illegal aliens may be detained pending their removal proceedings. The majority caps its discussion of caselaw by referencing *United States v. Salerno*, 481 U.S. 739 (1987), to conclude that "the Government must show, at some point, that the individual aliens 'present[] an identified and articulable threat to an individual or the community' or flight risk." *Ante*, at 31 (quoting *Salerno*, 481 U.S. at 751). True, *Salerno* upheld the Government's ability to detain criminal arrestees before trial after a hearing on dangerousness—but that holding in no way answers whether illegal aliens may be detained pending removal.

Even if removability alone does not justify detention, I cannot agree with the panel majority's determination that Congress may only detain "a limited subset of aliens [where justified by] a reasoned basis." *Ante*, at 28. Congress either has the power categorically to require detention of illegal aliens, or it does not. While colorable arguments can surely be made on either side of that question, "[t]he question of the constitutionality of an action taken by Congress does not depend on recitals of the power which it

undertakes to exercise." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 570 (2012) (quotation omitted). Yet the majority's approach expands and contracts Congress's power over immigration proceedings based on the adequacy—in the majority's estimation—of Congress's legislative findings. *Ante*, at 28–31. Thus, at the same time it rests on the maxim that the Constitution may not be overruled by statute, the panel majority allows *legislative history* to outrank Congress's constitutionally enumerated power over immigration. *See id.* at 30.

And were Congress required to provide a "reasoned basis" to justify its enactment of the detention provision of § 1225(b)(2)(A) based on the danger or flight risk that illegal aliens collectively presented, the legislative record offers ample support for Congress's policy decision. Contemporary congressional findings uniformly suggested that illegal aliens frequently evaded removal when prematurely released from custody. *See* H.R. REP. NO. 104-469, at 122 (1995) ("[M]any aliens simply fail to appear for their deportation hearing. . . . 27 percent of deportation proceedings are closed because aliens fail to appear for their hearings. The 'no-show' rate can exceed 50 percent in venues such as New York, Los Angeles, and Miami."); *id.* at 159 (Alien absences "impair[] the ability of the government to secure . . . deportation orders[.]"); *Removal of Criminal and Illegal Aliens: Hearing Before the Subcomm. on Immigr. and Claims of the House Comm. on the Judiciary*, 104th Cong., at 4 (Mar. 23, 1995) (Statement of T. Alexander Aleinikoff, General Counsel, Immigr. & Naturalization Serv.) ("In the past, far too many deportable aliens absconded with little or no consequence."). A 1996 DOJ report examining immigration decisions in major U.S. cities found that "when aliens are released from custody, nearly 90 percent abscond and are not removed from the United States." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) (citing Rep. No. I-96-03, *Immigration and Naturalization*

*Service Deportation of Aliens after Final Orders Have Been Issued*, Dep't of Just., Off. of the Inspector Gen. (Mar. 1996)).

The majority grapples with none of this, but nonetheless dismisses any evidence before Congress as "slight." *Ante*, at 30; *see also id.* at 30–31 ("[T]he Government has made no showing that Congress had before it evidence sufficient to furnish reasonable ground for" mandatory detention. (cleaned up)). To the contrary, Congress's choice in IIRIRA to require detention and prevent illegal aliens from skirting their removal proceedings was firmly supported by the evidence in 1996 and remains a rational policy today.[3]

The only remaining thing to address is whether the Constitution limits the duration of Petitioners' detention. In *Zadvydas*, the Supreme Court suggested (without holding) that the Constitution may set limits on the permissible length of an alien's detention *after* he is ordered removed. *Id.* at 690–99. And while *Zadvydas* indicates that post-removal order detention may not continue indefinitely, the opinion expresses no such reservations regarding detention *pending* removal proceedings, which has been squarely held to be "a constitutionally permissible part of [the removal] process." *Demore*, 538 U.S. at 531; *see also Zadvydas*, 533 U.S. at 701 ("[A]n alien may be held in confinement until it has been determined that there is no significant

[3] As our court observed earlier this year, the problem of illegal aliens ducking their removal proceedings "exists today at a much larger scale." *Buenrostro-Mendez*, 166 F.4th at 508; *see also* Holly Straut-Eppsteiner, *FY2023 Immigration Court Data: Case Outcomes*, Cong. Rsch. Serv. (Feb. 7, 2024) (finding that nearly 70% of deportation orders were in cases in which the alien failed to appear at their removal proceedings altogether); Mark Metcalf, *U.S. Immigration Courts & Aliens Who Disappear Before Trial*, Ctr. for Immigr. Stud. (Jan. 24, 2019) (observing that "American immigration courts consistently have the highest failure to appear (FTA) rates of any state or federal courts in the country" and that of "1,320,000 [released aliens who] received deportation orders, 75 percent of them (993,593) [were] for failure to appear." ).

likelihood of removal in the reasonably foreseeable future."). The *Zadvydas* Court considered a different provision of the INA, 8 U.S.C. § 1231(a), and concluded that the statute could not authorize unlimited detention. 533 U.S. at 698–99. By contrast, the Court has not read § 1225(b)(2)(A) to impose temporal limits on detention while an alien's removal proceedings are ongoing. *See Jennings*, 583 U.S. at 297–303 (distinguishing § 1225(b)(2)(A) from the statute at issue in *Zadvydas*).

The majority repeatedly refers to the constitutional problems that "indefinite" or "interminable" detention of illegal aliens like Petitioners would present. *See Ante*, at 23, 25, 28, 29, 30, 31, 32, 35. There is just one problem with this trepidation: No "indefinite" detention is threatened or even alleged in this case. Petitioners contest the *fact* of their detention, not its duration.

Contrast *Zadvydas*, where the petitioner's removal was "no longer practically attainable," such that continued detention did not serve its purported immigration purpose. 533 U.S. at 690. Here, Petitioners' removal remains "attainable," and their detention under § 1225(b)(2)(A) is neither "indefinite" nor "permanent." *Id.* at 690–91. Indeed, their detention will last only for the duration of "a [removal] proceeding under [8 U.S.C. §] 1229a." 8 U.S.C. § 1225(b)(2)(A); *see also Jennings*, 583 U.S. at 297 ("Once [removal] proceedings end, detention under § 1225(b) must end as well."). There is no allegation, much less any showing, that eventual removal is "no longer reasonably foreseeable," as *Zadvydas* indicates would create constitutional problems. 533 U.S. at 699; *see also id.* at 701 ("[A]n alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."). Thus, their detention still "necessarily serves the purpose of preventing" Petitioners "from fleeing prior to or during their removal proceedings, thus increasing

the chance that, if ordered removed, [Petitioners] will be successfully removed." *Demore*, 538 U.S. at 528.

Undeterred, the lead opinion goes on to probe "the length of a presumptively reasonable time for the Government to determine whether aliens like [Petitioners] should be removed." *Ante*, at 35. Looking to *Demore* to answer this question, JUDGE SOUTHWICK acknowledges that the *Demore* Court reversed the petitioner's grant of habeas despite his having spent six months in INS custody. *Id.* at 36 n.13 (quoting *Demore*, 538 U.S. at 510). The lead opinion even expresses that "[our court] could take [its] presumption from that six-month figure." *Id.* But after that zig, the lead opinion zags to scale down the acceptable length of detention without a hearing to "90 days [following] the commencement of detention[.]" *Id.* at 37. The basis? Nothing other than the *Demore* Court's observation that most removal proceedings (as of 2003) were completed within 90 days. *Id.* at 35–37 (citing *Demore*, 538 U.S. at 529 & n.9).

The majority's conclusion ignores the nearest guidance on temporal limitations to detention, supplied by *Zadvydas*. There, the Court expressed plainly that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701; *see also Banyee v. Garland*, 115 F.4th 928, 933–34 (8th Cir. 2024) (holding that a lawful resident alien could be detained pending removal for over a year as long as "deportation remain[ed] a possibility."). No such determination is even hinted at here. More pointedly, the *Zadvydas* Court expressed that six months' detention following a removal order should be treated as presumptively constitutional. *See* 533 U.S. at 701. Even treating that six-month timeframe as a hard limit on *pre-removal* detention, Petitioners were not detained anywhere near that long: Petitioner Gomez was detained for three months; Sosnava, for roughly two months; and Villegas, just three weeks.

Indeed, even under the majority's *own* 90-day standard, the detention of two of the Petitioners was not unconstitutionally lengthy, as the lead opinion concedes. *See Ante*, at 37 ("We agree with the Government that the timing of two of the grants of *habeas* in the cases was likely precipitate[.]"). So, to conclude that Petitioners' detention was (or would have been) unreasonably long, the majority substitutes its own standard in lieu of the limits counseled by the Supreme Court—and goes on to condone grants of habeas that were premature by the majority's own invented timeframe.

Though JUDGE SOUTHWICK appears to acknowledge that Petitioners' detention was not unconstitutionally lengthy at the time they received habeas relief, he nonetheless concludes that Petitioners "*would* today have been detained by immigration authorities for an unreasonable time absent the district courts' intervention." *Ante*, at 3 (emphasis added). His opinion provides no support for this inference. The lead opinion also asserts that "even if the orders we are reviewing had never been issued, these aliens would either have had a decision made as to their removal or would be detained while removal was still being considered," such that, if still detained, "today's opinion would require their release unless they had been provided a bond hearing[.]" *Id.* at 37. This is simply a tautology: If Petitioners had not received habeas relief, anything from removal to lawful admission could have occurred, or, as the majority conjectures, Petitioners' removal proceedings might remain pending. We will never know, however, because the district courts granted habeas prematurely, a mistake the majority simply excuses. *See ante*, at 37 ("[W]e see no reason to have any of [the Petitioners] detained again to serve additional time prior to a removal order."). Petitioners have never asserted that their removal is unforeseeable or that the Government has delayed in prosecuting their cases. In essence, the panel majority presumes that detention pending removal must be temporally limited, makes its own judgment as to what that limit is, and then

assumes that Petitioners' detention *would have been* unconstitutional under their own novel standard.

With great respect, such a holding is cut from whole cloth, and it lacks any meaningful guideposts for district courts to apply. If anything, the practical result will be the permissive regime sketched by JUDGE GRAVES's separate concurrence: immediate hearings, or immediate release, and reading § 1225(b)(2)(A)'s detention requirement out of operable existence. *Ante*, at 41-42 (GRAVES, J., concurring).

I do not dismiss the notion that substantive due process problems might arise if Petitioners' detention no longer served its immigration purpose or if Petitioners' removal proceedings were being used as a façade "to incarcerate [them] for other reasons." *Demore*, 538 U.S. at 533 (KENNEDY, J., concurring); *see also Banyee*, 115 F.4th at 934 (suggesting that "dilatory tactics" in removal proceedings could violate detainees' due process rights). Here, however, Petitioners have not challenged the duration of their detention as unconstitutional, nor have they asserted that their removal is "no longer practically attainable." *Zadvydas*, 533 U.S. at 690. On the record before us, the length of Petitioners' detention presents no constitutional violation warranting habeas relief.

* * *

Petitioners, having never been lawfully admitted to the country, are not entitled to additional process concerning their admission beyond what Congress provided in § 1225(b)(2)(A). Even assuming they were, procedural due process would not entitle them to a bond hearing to assess dangerousness or flight risk, factors that are immaterial to Petitioners' detention under § 1225(b)(2)(A). Further, Congress had the power to impose mandatory detention for aliens like Petitioners under § 1225(b)(2)(A), and the relatively

brief duration of their detention presents no constitutional defect requiring habeas relief to correct it.

None of that is to say that habeas relief would not be appropriate in circumstances different from these cases, *e.g.*, based on the length of detention or removal proceedings, or given factual questions relevant to whether "an alien seeking admission is not clearly and beyond a doubt entitled to be admitted," 8 U.S.C. § 1225(b)(2)(A), or based on other legal grounds not before us. But Petitioners, who are indisputably "applicants for admission" within the meaning of § 1225, have not established that their mandatory detention under § 1225(b)(2)(A) violated their rights to due process. The district courts erred in granting habeas relief on that basis, and those grants of habeas should be vacated.

I agree with my colleagues that the "answer to [our Nation's immigration] difficulties cannot include ignoring the Constitution." *Ante*, at 4. By the same token, neither the district courts nor ours is free to ignore the bedrock principle that the Constitution entrusts broad control over immigration proceedings to Congress, not the courts. *See* U.S. CONST. art. I, § 8; *Fiallo*, 430 U.S. at 792 ("This Court has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." (quotation omitted)).

I respectfully dissent.